[No. B109620. Second Dist., Div. One. Jan. 29, 1998.]

CITY OF ALHAMBRA, Plaintiff and Respondent, v.
P.J.B. DISPOSAL COMPANY, Defendant and Appellant.

COUNSEL

James R. Tweedy for Defendant and Appellant.

Leland C. Dolley, City Attorney, Burke, Williams & Sorensen, Harold A. Bridges, Rufus C. Young, Jr., and Christopher R. Cheleden for Plaintiff and Respondent.

OPINION

**VOGEL (Miriam A.), J.**—For years, P.J.B. Disposal Company (PJB) had an annually renewed, nonexclusive license to do business in the City of Alhambra, pursuant to which PJB could and did haul solid waste (trash) for its commercial customers. In 1994, the City complied with a new statutory scheme by circulating a request for proposals for exclusive or partially exclusive franchises for all commercial solid waste disposal within the City. Instead of responding, PJB unilaterally concluded that its business license

gave it a five-year continuation right under the new statute. Others did respond and, ultimately, the city issued four exclusive franchises to PJB's competitors. After PJB refused to relinquish its customers to the new franchisees, the City refused to renew PJB's business license, and this lawsuit followed. The City's motion for summary judgment was granted and PJB appeals. We affirm.

BACKGROUND

A.

In 1988, Californians generated more than 38 million tons of solid waste (about 1,500 pounds per resident), 90 percent of which was disposed of in landfills. (Pub. Resources Code, § 40000, subds. (a), (b).)[1] Existing landfills were filled almost to capacity and there was no coherent plan for the future. (§ 40000, subd. (d).) To remedy this situation, the Legislature adopted the California Integrated Waste Management Act of 1989 (§ 40000 et seq.) in order "to reduce, recycle, and reuse solid waste generated in the state to the maximum extent feasible in an efficient and cost-effective manner to conserve water, energy and other natural resources, to protect the environment, to improve regulation of existing solid waste landfills, to ensure that new solid waste landfills are environmentally sound, to improve permitting procedures for solid waste management facilities, and to specify the responsibilities of local governments to develop and implement integrated waste management programs." (§ 40052.) Toward accomplishment of these ends, the state's responsibility for solid waste management is now shared with local governments (§ 40001, subd. (a)), subject to oversight by a statewide Integrated Waste Management Board (§ 40400) operating with the assistance and advice of a Local Government Technical Advisory Committee (§§ 40701, 40705).

Under the Act, every city must have a Board-approved integrated waste management plan covering designated issues, including source reduction and recycling schedules (§§ 41750, subd. (a), 41800 et seq.), with each city determining for itself such things as the frequency and means of collection and transportation, the level of service to be provided, and the charges and fees to be imposed for these and similar services (§ 40059, subd. (a)(1)).[2] It is also up to each city to determine whether its waste handling services are to

[1]Unless otherwise stated, all section references are to the Public Resources Code.

[2]Counties and other governmental entities are also covered. For simplicity, we refer only to cities.

be provided by means of nonexclusive franchises, contracts, licenses, permits or otherwise, with or without competitive bidding, or by a partially or wholly exclusive franchise, contract, license or permit. (§ 40059, subd. (a)(2).) To protect qualified existing franchisees, contractors, licensees and permittees, section 40059, subdivision (b), makes it clear that the Act does not modify or abrogate in any manner "[a]ny franchise previously granted or extended by any [city]" or "[a]ny *contract, license, or any permit to collect solid waste* previously granted or extended by a city . . . ." (Italics added.) More specifically, section 49520 states that where "a local agency has authorized, by franchise, contract, license, or permit, a solid waste enterprise to provide solid waste handling services and those services have been provided for more than three previous years," the solid waste enterprise may continue to provide service for five years or, when the enterprise has an exclusive franchise or contract, for the unexpired contractual term, whichever is less.[3]

B.

For more than 17 years, PJB, a commercial solid waste hauler, operated in the City of Alhambra pursuant to a "non-exclusive business license, renewable annually by the City."[4] In due course after the Act became law, the City adopted (and the Board approved) an integrated waste management plan. In September 1994, in conformance with its plan, Alhambra distributed a formal, 50-page request for proposal (RFP) to a number of solid waste haulers, including PJB, inviting interested persons and companies to propose the terms and conditions on which they could and would provide a broad range of commercial solid waste services (collection, processing and marketing of recyclables, customer services, community relations and reporting). On page 2, under the heading, "RFP HIGHLIGHTS," the RFP states: "Several haulers currently provide Commercial Solid Waste collection services within the City. *It is the City's present position that none of these haulers qualify for 'grandfather' status, i.e., the right to continue service under Section 49521 of the Public Resources Code*, or other law. All proposers will be given the opportunity to compete for the franchise(s) which may

---

[3]A city's failure to submit a sufficient plan subjects it to civil penalties of up to $10,000 per day. (§§ 41813, 41850.)

[4]The quoted description is from a declaration submitted by PJB's president. Copies of the "licenses" dating back to 1979 are attached to the declaration, showing that they were garden-variety business tax registration certificates issued by cities upon the payment of a fee. (Bus. & Prof. Code, § 16000.) In one form or another, each states that the "person, firm or corporation named below is granted this business certificate pursuant to the provisions of the Alhambra Municipal Code to engage in, carry on, or conduct the business, trade, calling, profession, exhibition or occupation described below. Issuance of [this] certificate is not an endorsement nor certification of competence with other ordinances or laws." The "business described" on all of the licenses is "disposal service."

be awarded through this RFP process." (Italics added.) In the next paragraph, the RFP continued: "The City may award one exclusive Commercial Solid Waste franchise but it reserves the right to award multiple Commercial Solid Waste franchises. Proposals from proposers with expertise in some but not all of the services contemplated should discuss possible ways in which the Commercial Solid Waste wastestream might be divided in the interests of efficiency and economy."

PJB received a copy of the RFP but did not submit a proposal. According to PJB's president (Peter J. Bresson), he unilaterally decided that, "[b]y virtue of PJB's past record [as one of fifteen commercial solid waste haulers] with the City, there was no doubt in [his] mind that [PJB] was possessed of 'grandfather's rights' pursuant to [sections] 49520 and . . . 49521." Thus, although he "participated in the public hearings [held as part of the RFP process] and reviewed the many revisions of the RFP," and although he "was particularly concerned about the City's insistence that anyone submitting a bid was by doing so, relinquishing any 'grandfather's rights' which they might possess," he "elected not to participate in the bidding process, and instead chose to rely on [his] continuation rights pursuant to [section] 49520."[5]

At the end of the RFP process, the City awarded exclusive franchises to four commercial solid waste haulers (Perdomo & Sons, Inc., A-Trojan Disposal & Recycling Services Inc., Browning-Ferris Industries of California, and Zakaroff Recycling Services), all effective January 1, 1995. PJB, knowing the exclusive franchises had been issued to others, nevertheless continued to provide commercial solid waste hauling services within the City. When asked by the City to leave, PJB refused, and the City then refused to renew PJB's business license. In October 1995, the City filed this action against PJB for declaratory and injunctive relief. PJB answered and cross-complained for the same relief plus damages on a variety of tort theories. Discovery ensued, after which the City moved for summary judgment. The motion was granted, and PJB appeals from the judgment thereafter entered.

---

[5]In addition to the warning quoted in the penultimate paragraph, the RFP stated that, as one of several consequences of submission of a proposal, the proposer would waive whatever continuation rights it might otherwise have under section 49520 with regard to commercial solid waste hauling. Based on that language, PJB contends the City "insisted," as a condition for *submitting* a response to the RFP, that all continuation rights that would otherwise exist under section 49520 had to be waived. PJB is mistaken. The RFP expressly stated that "Proposers may take exception to this requirement."

DISCUSSION

■ PJB contends it is entitled to a five-year continuation right under section 49520 and that, therefore, the summary judgment must be reversed. We disagree.[6]

A.

Section 40059 confirms the City's right to determine the frequency and means of solid waste handling services and other matters of local concern, and permits it to provide for such services by "nonexclusive franchise, contract, license, permit, or otherwise" and, when authorized by the City's governing body, "by partially exclusive or wholly exclusive franchise, contract, license, permit, or otherwise, either with or without competitive bidding." (§ 40059, subd. (a).) Section 40059 also provides: "Nothing in [the Act] modifies or abrogates in any manner either of the following: [¶] (1) Any franchise previously granted or extended by any county or other local governmental agency. [¶] (2) *Any contract, license, or any permit to collect solid waste previously granted or extended by a city,* county, or a city and county." (§ 40059, subd. (b), italics added.)

Section 49510 declares: "(a) Although local agencies are authorized to furnish solid waste handling services, in extensive parts of the state solid waste enterprises are furnishing all or substantial portions of necessary solid waste handling services. [¶] (b) It is in the public interest to foster and encourage solid waste enterprises so that, at all times, there will continue to be competent enterprises willing and financially able to furnish needed solid waste handling services."

---

[6]Our resolution of this appeal involves an issue of statutory interpretation and makes it unnecessary to consider the City's contention that PJB would not in any event have had the ability to comply with the demands of the RFP. Although we do not decide the issue, we note that PJB never quite explains what it is that it ought to be permitted to do within the City of Alhambra. As things stand by reason of PJB's refusal to respond to the RFP and its refusal to discuss with the City at that time the possibilities for its participation as to some but not all of the required services, the City has issued four exclusive franchises to entities with the demonstrated ability to provide commercial waste hauling services that include tasks that PJB, a six-truck hauler, admitted would be "difficult" or impossible for it to handle, e.g., providing a commercial sector community relations program; furnishing processing facility capacity and the ancillary resources to prepare "green waste" and recyclable solid wastes for market, as well as marketing services for the prepared green waste materials and recyclables; providing emergency telephone service in English, Spanish, Chinese, "and other languages as may be necessary to communicate with callers"; creating and maintaining a computerized data base accessible to the City by disc or modem; purchasing liability insurance of $10 million plus substantial cash and performance bonds; and affording indemnification for the City with regard to CERCLA (42 U.S.C. § 9601 et seq., the Comprehensive Environmental Response, Compensation, and Liability Act).

Section 49520 provides: "*If a local agency has authorized, by franchise, contract, license, or permit, a solid waste enterprise to provide solid waste handling services* and those services have been provided for more than three previous years, the solid waste enterprise may continue to provide those services up to five years after mailed notification to the solid waste enterprise by the local agency having jurisdiction that exclusive solid waste handling services are to be provided or authorized, unless the solid waste enterprise has an exclusive franchise or contract. [¶] If the solid waste enterprise has an exclusive franchise or contract, the solid waste enterprise shall continue to provide those services and shall be limited to the unexpired term of the contract or franchise or five years, whichever is less." (Italics added.)

Section 49521 provides: "A solid waste enterprise providing solid waste handling services is subject to this chapter [Solid Waste Enterprises] only under both of the following conditions: [¶] (a) The services of the solid waste enterprise are in substantial compliance with the terms and conditions of the franchise, contract, license, or permit, and meet the quality and frequency of services required by the local agency in other areas not served by the solid waste enterprise. [¶] (b) The rates charged by the enterprise *may* be periodically reviewed and set by the local agency." (Italics added.)

Former section 154 of the Alhambra City Charter (repealed March 26, 1996) provided: "The grant of every *franchise or privilege* shall be subject to the right of the city, whether reserved in such grant or not, to prescribe and regulate the rates, fares, rentals and charges made for the service rendered under such franchise . . . ."[7] (Italics added.)

### B.

This is PJB's syllogism: PJB's business license was a "franchise or privilege" within the meaning of former section 154 of the City's charter,

---

[7]We summarily reject the City's contention that PJB is not entitled to any continuation rights simply because PJB did not, for three years "prior to receipt of mailed notification" of the RFP, meet the requirements of the RFP. The City's construction of section 49521 means that, for at least three years before the city adopted its new integrated waste management plan, PJB (and every other entity that responded to the RFP) would have had to not only anticipate the City's RFP requirements but also provide them (to whom we do not know). We also reject the City's contention that PJB is not entitled to any continuation rights simply because the city never exercised its rate-setting authority over PJB. A simple reading of the statute shows that all that is required is that the "rates charged by the enterprise *may* be periodically reviewed and set" by the City. (§ 49521, subd. (b), italics added.) A simple reading of former section 154 of the City's Charter shows that the City claimed the right to regulate the rates charged by its business licensees. For an otherwise qualified enterprise, no more would have been required.

pursuant to which the City could have regulated the rates paid by PJB's customers to PJB. At the time the RFP was circulated (and notice given of the City's intent to grant one or more exclusive franchises), PJB had been providing commercial solid waste hauling services to the City for more than three previous years (indeed, for about 17 years). For these reasons, says PJB, it qualifies for the five-year continuation right created by section 49520—because "[the City] *ha[d] authorized,* by license, [PJB] to provide solid waste handling services *and those services ha[d] been provided for more than three previous years.*"

PJB's kaleidoscopic view places a business license under a light that changes its substance as well as its form. When the reflecting plates and mirrors are put away and the Act is viewed as an unbroken whole, not as loose fragments of fact and law colored by the viewer's self-interest and arranged at a preset angle to exhibit the desired result, it is readily apparent that a "franchise, contract, *license,* or permit" (as those terms are used in section 49520) means an agreement or understanding between a solid waste enterprise and a city or county about the subject matter at hand—solid waste handling—and not a mere formality such as a business license.[8]

## C.

The continuation rights provided by section 49520 are the same as those previously provided by former section 4272 of the Health and Safety Code, which was repealed at the same time the Integrated Waste Management Act was enacted (Stats. 1989, ch. 1095, §§ 20, 32, pp. 3812, 3899-3900).[9] The legislative intent behind former section 4272 was to protect solid waste

---

[8]For purposes of our discussion, we assume without deciding that former section 154 of the City's Charter (which referred only to "franchises" and "privileges") gave the City the right to regulate the rates charged by its business licensees. A "franchise" is a privilege granted or sold, such as the right to sell a product or service (Black's Law Dict. (6th ed. 1990) p. 658, col. 1), and is clearly something more than a mere business license. Contrary to the City's position, however, former section 154 of the Charter was not limited to franchises. By its terms, it also covered every "privilege" granted by the City, and purported to permit the City to regulate the rates charged by every business operating pursuant to a "franchise or privilege." In this context, it appears that a "privilege" means a permit granted by a governmental body, generally for consideration, to pursue some occupation or to carry on some business; although it may not have the elements of a contract, it does confer a "privilege." (Black's Law Dict., *supra,* p. 1197, col. 1; cf. *American States W.S. Co.* v. *Johnson* (1939) 31 Cal.App.2d 606, 612 [88 P.2d 770]; *Rosenblatt* v. *Cal. St. Bd. of Pharmacy* (1945) 69 Cal.App.2d 69, 73-74 [158 P.2d 199].) For present purposes, we assume without deciding that this former charter provision was enforceable and that the City could have regulated the rates charged by some or all of its business licensees.

[9]All references to "former section 4272" are to former section 4272 of the Health and Safety Code. For easy comparison of section 49520 to former section 4272, we show the changes by quoting former section 4272, with italics, brackets and underscoring to show the

service *in general,* and the only time a *particular* solid waste company merited protection was when the protection was necessary to prevent harm to solid waste service in general. (*City of Santa Rosa* v. *Industrial Waste & Debris Box Rentals, Inc.* (1985) 168 Cal.App.3d 1132, 1136 [214 Cal.Rptr. 737].)[10] The Legislature's presumed awareness of *City of Santa Rosa*'s interpretation of former section 4272 at the time it enacted section 49520 without any meaningful change places the Legislature's imprimatur on that interpretation (*Bailey* v. *Superior Court* (1977) 19 Cal.3d 970, 977-978, fn. 10 [140 Cal.Rptr. 669, 568 P.2d 394]), and also suggests a legislative adoption of *City of Santa Rosa*'s implicit assumption that the statute applies to specific contracts, franchises, permits and licenses issued in accordance with a governmental body's collection plan, not to every person or entity holding a business license. (*City of Santa Rosa* v. *Industrial Waste & Debris Box Rentals, Inc., supra,* 168 Cal.App.3d at p. 1134; but see § 49510.)[11]

---

differences between the two statutes: "*Where* [If] a local agency has authorized, by franchise, contract, license, or permit, a solid waste enterprise to provide solid waste handling services and *such* [those] services have been provided for more than three previous years, the solid waste enterprise may continue to provide *such* [those] services up to five years after mailed notification to the solid waste enterprise by the local agency having jurisdiction that exclusive solid waste handling services are to be provided or authorized, [.¶] *except that* if [If] the solid waste enterprise has an exclusive franchise or contract[,] *then* the solid waste enterprise has an exclusive franchise or contract, the solid waste enterprise shall continue to provide *such* [those] services and shall be limited to the unexpired term of the contract or franchise or five years, whichever is less." There are no other changes. To the extent former section 4272 covered the rights of a solid waste enterprise affected by a city's annexation of the area served by the enterprise, those provisions are now found in section 49522.

[10]There is one other case construing the relevant provisions of the Act, but that case is not on point. In *Waste Management of the Desert, Inc.* v. *Palm Springs Recycling Center, Inc.* (1994) 7 Cal.4th 478 [28 Cal.Rptr.2d 461, 869 P.2d 440], the issue was whether the word "*waste*" (as in "solid waste handling") includes property (specifically, recyclable material) before it is discarded by its owner. (*Id.* at p. 484.) It does not, because it has value and has not yet been discarded. (*Ibid.*)

[11]In *City of Santa Rosa,* two solid waste haulers claimed the exclusive right to service a newly annexed section of the city. A preexisting contract made by one of the haulers with the County of Sonoma was about to expire, and that hauler claimed a five-year continuation right under former section 4272. The other hauler had an existing exclusive contract covering the entire city. *City of Santa Rosa* holds that the Legislature intended to grant the five-year continuation right to all companies that had *non*exclusive agreements (express or "de facto") in order to protect the "precarious" existence of such companies and thus encourage them to capitalize sufficiently. As to companies with *exclusive* franchises or contracts, *City of Santa Rosa* holds that the Legislature intended to give them a five-year continuation right only when that period was shorter than the remaining term of their unexpired contracts, apparently because such companies, knowing the dates on which their contracts would terminate, were better able to plan for capital investments, financing and amortization. (*City of Santa Rosa* v. *Industrial Waste & Debris Box Rentals, Inc., supra,* 168 Cal.App.3d at pp. 1134-1137.) This interpretation is entirely consistent with the legislative history of the refuse industry-sponsored legislation that first distinguished between exclusive and nonexclusive arrangements for solid waste disposal services.

No other construction makes sense—particularly since application of PJB's approach would mean that any entity that had (a) paid for a business license for three or more years and (b) provided commercial solid waste handling services on an odd-job or other occasional basis as infrequently as once a year for three or more years, would be entitled to five-year continuation rights under section 49520. Generally, the law rejects absurd constructions. (*Solvang Mun. Improvement Dist.* v. *Board of Supervisors* (1980) 112 Cal.App.3d 545, 555-556 [169 Cal.Rptr. 391].) Specifically, *City of Santa Rosa* v. *Industrial Waste & Debris Box Rentals, Inc., supra,* 168 Cal.App.3d 1132 and the legislative declarations in the Integrated Waste Management Act demand rejection of PJB's construction simply because it is inconsistent with the Legislature's intent.

### D.

Plainly, the legislative intent behind the Integrated Waste Management Act was to address the problem created by the relentlessly increasing amounts of solid waste generated by Californians and the exponentially diminishing availability of landfill space for disposal. (§ 40000.) So that future generations will not be buried alive in garbage, the Legislature drafted a coherent plan for the reduction, recycling and reuse of solid waste "to the maximum extent feasible in an efficient and cost-effective manner." (§ 40052.) Overall, the Legislature set out "to conserve water, energy and other natural resources, to protect the environment, to improve regulation of existing solid waste landfills, to ensure that new solid waste landfills are environmentally sound, to improve permitting procedures for solid waste management facilities, and to specify the responsibilities of local governments to develop and implement integrated waste management programs." (§ 40052.) More specifically, the Legislature gave local governments the right, and imposed upon them the obligation, to assume responsibility for their own solid waste handling procedures. (§§ 40001, subd. (a), 40400, 40701, 40705.)

For these reasons, the City of Alhambra was required by law to develop and put into effect an integrated waste management plan covering designated issues, including source reduction and recycling schedules. (§§ 41750, subd. (a), 41800 et seq.) It was just such a plan that resulted in the City's issuance of the RFP that ultimately led to the termination of PJB's right to haul commercial solid wastes within the City's borders.[12] Under the Act, it was up to the City to determine the frequency and means of collection and

---

[12]We decline PJB's implied invitation to focus on the City's refusal to renew its business license, and look instead to the reason for that refusal—PJB's insistence that it had the right to continue to "do business" in the City by hauling commercial solid wastes for its "custom-

transportation, the level of services to be provided, and the limits, if any, on fees and charges, and also to determine whether these services should be provided by nonexclusive, exclusive or partially exclusive franchises, contracts, licenses or permits. (§ 40059, subd. (a).)

It is in this context that the protections given to existing haulers must be viewed. Whatever other changes the Legislature may have wrought with its enactment of the Integrated Waste Management Act, we are satisfied that its intent vis-à-vis the effect of former section 4272 remained the same—*to protect solid waste service in general*, and to provide protection for particular haulers only when necessary to protect service in general. (*City of Santa Rosa* v. *Industrial Waste & Debris Box Rentals, Inc., supra,* 168 Cal.App.3d at p. 1136.) The need for protection of the whole rather than one of its parts had increased by 1988, not decreased. That the Legislature recognized that fact is stated in section 40000. That the Legislature recognized the need to stay with the construction given to former section 4272 and to carry it forward into section 49520 is shown by section 40059, subdivision (b), which precludes an interpretation of the act that would modify or abrogate in any manner "[a]ny franchise previously granted or extended by any [city]" or "[a]*ny contract, license, or any permit to collect solid waste previously granted or extended by a city* . . . ." (Italics added.) The italicized phrase highlights the problem with PJB's approach and, properly parsed, illustrates the Legislature's intent to protect an existing "*license . . . to collect solid waste* previously granted or extended by a city," *not* a mere *license to conduct business.*

Read logically and with the emphasis where it clearly belongs, section 49520 creates a five-year continuation right when a city has "*authorized, by* [*nonexclusive*] *license,* . . . *a solid waste enterprise to provide solid waste handling services* and those services have been provided for more than three previous years . . . ." (Italics added.) When we read this italicized phrase in harmony with the plain meaning of section 40059, the legislative intent is obvious—to grant a five-year continuation right to an enterprise with an existing city-issued nonexclusive license to collect solid waste on specified terms and conditions and in specified areas of the city, *not* to every enterprise that fortuitously happened to have a three-year-old license to do business within the city's borders.

### E.

Our interpretation is consistent with the legislative history of the Act and its predecessor statutes, including former section 4272. At the time former

---

ers," notwithstanding that the City had rightfully granted to others exclusive franchises that precluded PJB's continuing involvement.

section 4272 was enacted, "[e]xisting law require[d] a city which ha[d] incorporated or annexed territory to allow *county-authorized private refuse collection services* to continue for three years if the service [was] of the same quality and frequency as refuse services in the city. . . . [By way of a 1976 amendment to former section 4272 to distinguish between those existing arrangements that were exclusive and those that were not], a private refuse collection service, which [had] provided services by franchise, contract, or permit for three years, [could] operate for up to another five years after a local agency notifie[d] the firm that it intend[ed] to change the method of collection. The length of continued service . . . would be less if the firm [had] an exclusive contract which expir[ed] within five years. . . ." (Governor's Office of Planning & Research, Enrolled Bill Rep. on Assem. Bill No. 1938 (1975-1976 Reg. Sess.) July 2, 1976, p. 1, italics added, citing Health & Saf. Code, former § 4270 et seq.)[13]

With this historic perspective, it is clear that section 49520 and former section 4272 were designed to protect the economic interests of solid waste enterprises that had direct contractual relationships with cities, counties and other local agencies, not just with the ultimate consumers (the customers of the enterprise). In the 1970's, the Legislature reacted to the haulers' parochial concerns that arose from annexation. By the late 1980's, when the Integrated Waste Management Act was adopted to forestall a statewide disaster, the Legislature did not change the particular provision with which we are now concerned, apparently satisfied that the existing protections for solid waste enterprises were sufficient to protect the contractual rights of those enterprises with existing *solid waste handling contracts with local governmental entities,* whether by franchise, permit, license or otherwise.

Neither then nor now, however, did the Legislature say or do anything to suggest an intent to grant a five-year continuation right to a previously unregulated hauler whose only contractual relationship was with his customers and whose only obligation to the city was to pay an annual business license fee. Since it is undisputed that PJB's only claim to continuation

---

[13]In the Legislative Counsel's Digest of the Bill as it was amended in the Assembly on January 26, 1976, but before it was further amended in the Senate, we are told that the amendment "require[d] any county [or] city . . . *authorizing or providing for exclusive solid waste handling services on any existing service route,* to permit any solid waste enterprise, which ha[d] been previously engaged for more than 3 years in *providing services on the route pursuant to a [nonexclusive] franchise, contract, license, or permit from the local agency . . . ,* to continue to provide such services for not less than 5 years" on specified conditions that did not adversely affect "*other areas not served by the enterprise . . . .*" (Legis. Counsel's Dig., Assem. Bill No. 1938 (1975-1976 Reg. Sess.) as amended Jan. 26, 1976, pp. 1-2, italics added.)

rights is based on its business license, the summary judgment against it must be affirmed.[14]

## DISPOSITION

The judgment is affirmed. The parties are to pay their own costs of appeal.

Spencer, P. J., and Ortega, J., concurred.

---

[14]Notwithstanding our conclusion, we do not mean to suggest that the Act is a model of clarity. The nature of the legislative process suggests that any ambiguity in section 49520 is most probably the intended product of compromise, but we do not purport to be legislative mind-readers. If we have misconstrued the existing data in divining legislative intent, we are confident the Legislature will respond accordingly. (See Office of Planning & Research, Enrolled Bill Rep. on Assem. Bill No. 1938, *supra*, p. 2 [in discussing the economic consequences of an abrupt termination of a contract when a new city is incorporated to include a solid waste hauler's route or when a city or county decides to terminate its own licenses or permits and replace them with refuse contracts or franchises, the 1976 report noted that the "problem [was] most apparent in Southern California where about 3/4 of the area's 1,500 operators work under business licenses and permits; 850 of these are in Los Angeles County"]; see also former Gov. Code, § 35005 [repealed by Stats. 1976, ch. 430, § 1, p. 1101].)