**CITY OF LOS ANGELES, et al., Plaintiffs,**

v.

**COUNTY OF KERN, et al., Defendants.**

**No. CV# 06–5094 GAF (VBKx).**

United States District Court, C.D. California.

Aug. 10, 2007.

Rockard J. Delgadillo, City Attorney, Christopher M. Westhoff, Assistant City Attorney, Kieth W. Pritsker, Deputy City Attorney, Los Angeles City Attorney's Office, Los Angeles, CA, for City of Los Angeles.

James J. Dragna, Thomas S. Hixson, Marc R. Bruner, Bingham McCutchen LLP, Los Angeles, CA, James B. Slaughter, Gary Smith, Beveridge & Diamond P.C., Washington, DC, for City of Los Angeles, Responsible Biosolids Management, Inc. R&G Fanucchi, Inc., and Sierra Transport, Inc.

Daniel V. Hyde, Paul J. Beck, Lewis Brisbois Bisgaard & Smith, LLP, Los Angeles, CA, for County Sanitation District No. 2 of Los Angeles County.

Bradley R. Hogin, Woodruff Spradlin & Smart, Orange, CA, for Orange County Sanitation District.

Michael J. Lampe, Law Offices of Michael J. Lampe, Visalia, CA, for Shaen Magan, Honey Bucket Farms, Tule Ranch/Magan Farms and Western Express, Inc.

Roberta L. Larson, Jonathan Schutz, Somach Simmons & Dunn, Sacramento, CA, California Association of Sanitation Agencies.

Bernard C. Barmann, Sr., County Counsel, Bakersfield, CA, for County of Kern and Kern County Board of Supervisors.

## ORDER RE: CROSS–MOTIONS FOR SUMMARY JUDGMENT, PLAINTIFFS' MOTION TO STRIKE

GARY ALLEN FEESS, District Judge.

## I.

### INTRODUCTION

Plaintiffs City of Los Angeles, Orange County Sanitation District, and County

Sanitation District No. 2 of Los Angeles County generate large amounts of sewage treatment residues known as "sludge" or "biosolids," some substantial portion of which they ship to farmland located in unincorporated areas of Kern County for use as fertilizer. This arrangement has, perhaps predictably, aroused substantial local opposition in Kern County even though the EPA considers land application to be a safe, effective means of recycling biosolids.

That opposition reached a fever pitch in 2006 when a local State Senator sponsored a ballot initiative known as Measure E, which sought to ban land application of biosolids in the unincorporated areas of the County. The initiative campaign included colorful attacks on "Los Angeles sludge" and drew on long-simmering anti-Southern California sentiment for support. There being no "Friends of Sludge" to mount opposition to the initiative, the ordinance passed overwhelmingly, and therefore threatened to permanently ban Plaintiffs from further land application at their Kern County facilities. And though the ban may at first impression appear to eliminate all land application of sludge in Kern County, it actually imposes relatively few burdens on in-county interests. Without acknowledging any irony, Kern County ships its materials to a local composting company for sale to private firms out of its jurisdiction. Moreover, local cities continue to apply biosolids on land in their incorporated areas which are outside of Kern County's jurisdiction. By contrast, Measure E would effectively force Plaintiffs out of the County.[1]

In an effort to preserve their biosolids recycling programs, the government Plaintiffs, along with private firms and individuals that handle the material, filed suit against Defendants Kern County and Kern County Board of Supervisors (collectively "Kern") on a variety of constitutional and statutory grounds. After dismissing some of their claims, *City of Los Angeles v. County of Kern*, No. CV 06–5094, 2006 WL 3073172 (C.D.Cal. Oct.24, 2006) (*"Kern I"*), this Court preliminarily enjoined enforcement of Measure E, as it concluded that Plaintiffs, though not likely to succeed on their Equal Protection claim, demonstrated irreparable harm and a likelihood of success on their claims that Measure E(1) violated the dormant Commerce Clause; (2) was preempted by the California Integrated Waste Management Act ("CIWMA"); and (3) exceeded Kern's police power under the California Constitution. *City of Los Angeles v. County of Kern*, 462 F.Supp.2d 1105 (C.D.Cal.2006) (*"Kern II"*).

Kern has now moved for summary judgment on all claims, and Plaintiffs have filed a cross motion for summary judgment on the CIWMA claim. In their opposition to Kern's motion for summary judgment, Plaintiffs also ask the Court to enter summary judgment in favor of their Commerce Clause and police power claims (though not in favor of their Equal Protection claim).

The Court agrees with Kern that Plaintiffs' Equal Protection claim fails as a matter of law. Measure E rationally furthers legitimate local interests in guarding against potential environmental harm and nuisance associated with biosolids, and Plaintiffs have failed to demonstrate that these purposes were merely pretextual. Although the campaign attacks on "Los Angeles sludge" certainly demonstrated animosity towards the government Plaintiffs, this animosity was directly related to the perceived harm Measure E legitimate-

---

**1.** For convenience, the Court refers to the political entity as "Kern" and the geographic region as the "County."

ly sought to redress. In short, Plaintiffs were rationally perceived as polluters, and so a campaign including rhetoric against them does not mean Measure E's stated environmental purposes were mere pretext for something more nefarious. Moreover, Measure E advanced Kern's environmental interests by banning the perceived pollutants. Measure E is therefore not irrational, and thus survives scrutiny under the Equal Protection clause.

By contrast, Measure E faces stricter scrutiny under the Commerce Clause because of the ban's discriminatory effects against interstate commerce when viewed County-wide. In short, while the campaign attacks on "Los Angeles sludge" are compatible with Measure E's apparent legitimate purpose under Equal Protection jurisprudence, the attacks graphically expose Measure E's objective of removing Plaintiffs' operations from the County as a whole, which would force them to locate and develop alternate recycling sites, most probably in Arizona. But at the same time that Measure E is forcing Los Angeles and others out of Kern County, it allows in-county sludge producers to continue disposing of their biosolids locally, thus accomplishing its legitimate environmental purpose through impermissible means. This discriminatory effect requires the Court to subject Measure E to strict scrutiny, which it cannot withstand because Kern could easily have guarded against the perceived environmental harm with a more tailored regulation regarding the location quality, and volume of biosolids that could be applied to land. Plaintiffs therefore prevail as a matter of law on their Commerce Clause claim.

Also meritorious is Plaintiffs' CIWMA claim. Plaintiffs present the same argument that the Court accepted in granting the preliminary injunction: that CIWMA expresses a statewide policy of promoting recycling over other disposal methods for "solid waste," which the statute defines to include biosolids. Therefore, Plaintiffs argue, a ban on land application frustrates this statutory purpose and thus is invalid because of conflict preemption, notwithstanding a savings clause that allows local regulations so long as they do not conflict with the policies expressed by the statute. Though Kern advances a barrage of arguments to the contrary, each is fairly easily rejected.

Finally, the Court cannot summarily resolve the police powers cause of action. Kern's motion against this claim is based solely on arguments that—incorrectly—contend Measure E is exempt from the "regional welfare" doctrine which limits exercises of the police power. On the other hand, Plaintiffs' motion fails because disputes remain as to the impact of their biosolids operations on the local environment and the impact of Measure E on the surrounding region.

However, because the police powers claim would involve significant expense to litigate and because Plaintiffs' Commerce Clause and CIWMA preemption claims entitle them to all the relief sought, the Court shall grant Plaintiffs' request for entry of final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

## II.

### STATEMENT OF FACTS

The following facts are undisputed and reflect the Court's ruling on the parties' evidentiary objections.

### A. OVERVIEW OF BIOSOLIDS

EPA regulations define "sewage sludge," also referred to as "biosolids," as the "solid, semi-solid, or liquid residue generated during the treatment of domestic sewage in a treatment works." 40

C.F.R. § 503.9(w). Municipalities typically dispose of sewage sludge in one of several ways, one of which is known as "land application." "Land application" means the spraying, spreading or other placement of biosolids onto the land surface, the injection of biosolids below the surface, or the incorporation of biosolids into the soil. *Id.* § 503.9(h). In 2003, the EPA estimated that approximately 60 percent of sewage sludge nationwide was treated and applied to farmland; of the remaining 40 percent, 17 percent was buried in landfills, 20 percent was incinerated, and 3 percent was used as landfill or mine reclamation cover. 68 Fed.Reg. 68817 (Dec. 10, 2003). The EPA estimates that sludge is applied to approximately 0.1% of available agricultural land in the United States. (Pls'. Ex. 11 [National Research Council Report: Biosolids Applied to Land: Advancing Standards and Practices, 2002] at 311.)

The EPA regulations of biosolids are codified at 40 C.F.R. § 503 and are known commonly as the "Part 503" regulations. Part 503 differentiates between Class A and Class B sewage sludge depending on the concentration of pathogens, disease causing micro-organisms, remaining after treatment. *See* 40 C.F.R. § 503.32. While Class A sewage sludge is sufficiently treated to essentially eliminate pathogens, Class B sewage sludge is treated only to substantially reduce them. *See id.* For these reasons, the requirements for, and restrictions placed on, land application of Class B sewage sludge are more stringent than those imposed on Class A sewage sludge. *See id.* For example, Part 503 requires controls on Class B sites such as restrictions on human access to the farm fields and setbacks from property lines that guarantee safety. *See id.* § 503.32(b)(5). By contrast, Class A biosolids have almost no restrictions on human handling, *see id.* § 503.32(a), and are often bagged for retail sale to home gardeners, (Pls'. Ex. 4 [Page P.I. Decl.] ¶ 11).

In addition to pathogens, the Part 503 rules also limit the amounts of trace metals that can be found in biosolids at the parts per million level. 40 C.F.R. § 503.13. Biosolids that are sufficiently low in metals qualify as "Exceptional Quality" ("EQ"), and the EPA allows wider use of such biosolids.

## B. LAND APPLICATION IN GENERAL

The collection and treatment of wastewater, and the resulting generation of biosolids that must be recycled or disposed of, is a "constant, non-discretionary governmental function." (Defs'. Separate Statement of Undisputed Material Facts in Opp. to Pls'. Mot. ("DOSSUF") ¶ 10.) In other words, government agencies cannot decide to stop producing biosolids and instead must find ways to manage those that are produced. (Pls'. Ex. 18 [Bahr P.I. Decl.] ¶ 11.) Government agencies generally regard land application to be the best way to manage the material. The parties agree that land application constitutes a "beneficial use" of biosolids, and indeed the EPA explains that it adopted the term "biosolids" so as "to emphasize the beneficial nature of this valuable, recyclable resource (i.e., the use of the nutrients and organic matter in biosolids as a fertilizer or soil condition)." (Minamide Decl. ¶ 6, Ex. A ["A Guide to Biosolids Risk Assessments for the EPA Part 503 Rule"].) The EPA has also stated that "[b]eneficial use of biosolids reclaims a wastewater residual, converting it into a resource that is recycled to land." (*Id.* ¶ 7, Ex. B ["A Plain English Guide to the EPA Part 503 Biosolids Rule"].) The EPA therefore promotes land application. (Defs'. Ex. 13 [2000 EPA Audit Report: Biosolids Management and Enforcement] at ii.)

At the same time, the EPA has consistently recognized at least the potential that biosolids could be dangerous. The preamble to the Part 503 regulations, which were

published in 1993, acknowledges that they "may not regulate all pollutants in sewage sludge that may be present in concentrations that adversely affect public health and the environment." 58 F.R. 9248–01. The preamble also acknowledges uncertainties in several important aspects of the risk assessment on which the Part 503 regulations are based, including uncertainties concerning the impacts of land application of biosolids on human health, plant toxicity, wildlife, and ground water. *Id.*

In light of these uncertainties, the EPA called for further research. In 1996, the EPA asked the National Academy of Sciences to study the safety and practicality of using biosolids in human food crop production. The resulting report concluded that land application presented negligible risk to humans and the environment and also provided many benefits. (Pls'. Ex. 10 [1996 Report: Use of Reclaimed Water and Sludge in Food Crop Production] at 305.) The committee that authored the report also noted that there had been no reported outbreaks of infectious disease associated with a population's exposure to adequately treated biosolids. (Page Decl. ¶ 14.) According to the chair of the 1996 committee, this observation remains accurate. (*Id.*)

Research on biosolids continued. In 2002, the EPA asked the National Research Council ("NRC") of the National Academy of Sciences to evaluate the Part 503 regulations by evaluating the technical methods and approaches used to establish chemical and pathogen standards for biosolids, focusing specifically on human health protection (and not ecological or agricultural issues) The NRC found:

> There is no documented scientific evidence that the Part 503 rule has failed to protect public health. However, additional scientific work is needed to reduce persistent uncertainty about the potential for adverse human health effects from exposure to biosolids. There have been anecdotal allegations of disease, and many scientific advances have occurred since the Part 503 rule was promulgated. To assure the public and to protect public health, there is a critical need to update the scientific basis of the rule to (1) ensure that the chemical and pathogen standards are supported by current scientific data and risk-assessment methods, (2) demonstrate effective enforcement of the Part 503 rule, and (3) validate the effectiveness of biosolids-management practices.

(Defs'. Ex. 12 [2002 NRC Report: Biosolids Applied to Land] at 4.) With respect to health effects, the NRC study stated that "[t]oxic chemicals, infectious organisms, and endotoxins or cellular material may all be present in biosolids" and "[t]here are anecdotal reports attributing adverse health effects to biosolids exposures, ranging from relatively mild irritant and allergic reactions to severe and chronic health outcomes." (*Id.* at 5.)

The NRC study further stated that although "a causal association between biosolids exposures and adverse health outcomes has not been documented ... [t]o date, epidemiological studies have not been conducted on exposed populations, such as biosolids appliers, farmers who use biosolids on their fields, and communities near land-application sites." (*Id.* at 121–22.) Because of the anecdotal reports of adverse health effects, the public concerns, and the lack of epidemiological investigation, the study concluded that EPA should conduct further research that examine exposure and potential health risks to worker and residential populations. (*Id.*)

Further research has since occurred, but as yet has uncovered nothing that would change the EPA's conclusion that land application in compliance with the Part 503 regulations is safe. (Pls'. Ex. 7 [Pepper. Suppl. P.I. Decl.] ¶ 7.)

*C. THE PARTIES AND THEIR BIOSOLIDS OPER-ATIONS*

1. PLAINTIFFS

**a. The City of Los Angeles Operation**

Plaintiff City of Los Angeles ("the City") has been land applying biosolids in Kern County since 1994. (DOSSUF ¶ 1.) The City collects wastewater generated by residential, commercial, and industrial users in Los Angeles and surrounding communities, and then treats this wastewater at its Hyperion, Terminal Island, Glendale, and Tillman treatment and water reclamation plants. The wastewater treatment process generates solid residuals, which are then further treated and eventually reconstituted into biosolids at the City's Hyperion and Terminal Island plants. (*Id.* ¶ 2.)

The City then sends its biosolids to a site known as "Green Acres" in the unincorporated area of Kern County, which it purchased in 1999 for $15 million. (Pls'. Ex. 1 [Minamide P.I. Decl.] ¶ 7.) [2] The site is a 4,700–acre piece of land about 15 miles southwest of Bakersfield and about 120 miles north of Los Angeles, and is a functioning farm that mainly grows crops used for animal feed. (*Id.* ¶¶ 7, 20, 23, 27; Johnson Decl. ¶ 7.) The Green Acres biosolids program is administered by Plaintiff Responsible Biosolids Management, Inc. ("RBM"), which has been under contract with the City since 1996. (Pls'. Ex. 2 [Stockton P.I. Decl.] ¶ 8.) RBM subcontracts some amount of the hauling responsibilities to Plaintiff Sierra Transport, Inc., which involves approximately 26 tractor trailer loads of biosolids a day. (Pls'. Ex. 2 [Stockton P.I. Decl.] at 14.) Plaintiff R & G Fanucchi, Inc. performs the farming at

Green Acres and has contracted with Los Angeles since 2003 to land apply a minimum of 200,000 tons of biosolids there each year. (Pls'. Ex. 20 [Fanucchi P.I. Decl.] ¶ 3.) All biosolids applied to land at Green Acres are Class A EQ. (Pls'. Ex. 1 [Minamide P.I. Decl.] ¶ 7.)

Green Acres has been described by one expert as "one of the best monitored and professionally operated land application sites." (Pls'. Ex. 4 [Gerba P.I. Decl.] ¶ 10.) In addition, the Green Acres site is particularly well-suited for land application because its soil contains multiple layers of silt known as hardpan. The hardpan helps to protect groundwater, which, beneath Green Acres, is extremely deep below the surface. (Pls'. Ex. 2 [Stockton P.I. Decl.] ¶ 32.) Further, Green Acres is easily accessible by nearby highways, including Interstate 5 and California Highway 119. (Pls'. Ex. 2 [Stockton P.I. Decl.] ¶ 32.) Land use in the vicinity of Green Acres is predominantly agricultural, consisting of range land, dairies, and irrigated row crops. Oil fields are also nearby, and there are no adjacent residences. (Pls'. Ex. 3 [Johnson P.I. Decl.] ¶ 8; Pls'. Ex. 5 [Gerba P.I. Decl.] ¶ 10.) Experts have opined that the biosolids operation at Green Acres presents no threat to the environment that is discernable—at least based on current science. (Pls'. Ex. 3 [Johnson P.I. Decl.] ¶ 18; Pls'. Ex. 6 [Pepper P.I. Decl.] ¶ 8.)

Though remote, Green Acres impacts negatively on certain activities. It emanates strong odors and attracts an unusual amount of flies—conditions which can be observed en route to and at the nearby Buena Vista Aquatic Recreation Area, making water-skiing there less enjoyable (Frantz Decl. ¶¶ 17, 19.) [3] Green Acres

---

**2.** Documents cited with the designation "P.I." are declarations originally submitted in support of Plaintiffs' preliminary injunction motion and which have been resubmitted in support of the cross motions for summary judgment.

**3.** The declaration of Tom Frantz is offered by Intervenor Association of Irritated Residents

also lies adjacent to the Kern Water Bank, which sits atop an underground aquifer used to store water for extraction during dry years. (Defs'. Ex. 41 [Parker Decl.] ¶¶ 2, 8.) Particularly when water is extracted during dry years, groundwater levels can drop rapidly, potentially causing groundwater from under Green Acres to move into the aquifer. (*Id.* ¶ 9.) The same is true for the Arvin–Edison aquifer, which is twelve miles from Green Acres. (Defs'. Ex. 40[Collup Decl.] ¶ 12.) Notably, however, the record contains no evidence that the groundwater beneath Green Acres has been contaminated,[4] and indeed results of groundwater monitoring and sampling data from the region since 1975 indicate no significant impacts to groundwater quality

resulting from application of biosolids at Green Acres. (Pls'. Ex. 3 [Johnson P.I. Decl.] ¶ 8.)

### b. Orange and Los Angeles Counties' Operations

Plaintiffs Orange County Sanitation District ("OCSD") and County Sanitation District No. 2 of Los Angeles County ("CSD No. 2") operate wastewater treatment plants in Orange County and Los Angeles County, respectively, which generate biosolids that are recycled by Plaintiff Shaen Magan at sites in Kern County known as Honey Bucket Farms and Tule Ranch. (DOSSUF ¶ 4.) OCSD has been land applying biosolids under contract at Tule Ranch since 1996. (*Id.* ¶ 5.) Similar to the

("AIR") in support of Kern's reply papers Plaintiffs move to strike the entire declaration because it was offered for the first time in a reply. However, while the Ninth Circuit has held that new evidence should not be presented in a reply brief, it also allows district courts to consider such evidence after giving the non-moving party an opportunity to respond *Provenz v. Miller,* 102 F.3d 1478, 1483 (9th Cir.1996) (citing *Black v. TIC Inv. Corp.,* 900 F.2d 112, 116 (7th Cir.1990)) Here, the Court allowed Plaintiffs to respond to the portions of Kern's reply brief which cited the Frantz declaration by filing a sur-reply. (Order of July 24, 2007 re: Further Briefing.) Therefore, the Court shall consider the portions of the Frantz Declaration that are otherwise admissible, as are the portions cited above. However, the Court agrees with Plaintiffs that significant portions of the Frantz Declaration are inadmissible. Frantz does not explain how his status as a farmer in Kern County qualifies him as an expert on the effects of biosolids, and virtually all of his testimony is based not on his personal knowledge, but rather his concerns and beliefs. Such testimony is inadmissible on summary judgment. *See* Fed.R.Civ.P. 56(e); Fed. R. Evid 701, 702; *Bank Melli Iran v. Pahlavi,* 58 F.3d 1406, 1412 (9th Cir.1995) (declarations must be on personal knowledge to carry weight at summary judgment). Moreover, to the extent AIR offers Frantz's beliefs as evidence of Measure E's benign intent, the evidence does not support this proposition be-

cause Frantz does not declare that he voted for, drafted, or participated in the campaign for the Measure Therefore, the factual assertions in paragraphs 4 through 16, 18, and 20 through 39 of the Frantz Declaration are inadmissible, and Plaintiffs' motion to strike them is **GRANTED,** as is the motion to strike the Appendices to the Frantz Declaration, which are scientific studies identifying potential risks from biosolids, but are without foundation without Frantz's testimony The motion to strike is **DENIED,** however, as to paragraphs 17 and 19, cited above.

4. Intervenor Kern County Water Agency proffers the testimony of its general manager, James Beck, who opines that sewage sludge poses a threat to adjacent groundwater banking facilities. He bases this opinion on a University of California study, which is not in the record, that found the crops grown on sludged land did not "take up" all the salts introduced by the sludge From this, Beck infers that to the extent sludge contains contaminants, those contaminants could remain behind in the soil and eventually make their way into the groundwater. (Beck Decl. ¶¶ 5–8.) Beck does not explain his qualifications as an expert, however, and they are not facially apparent from his position Therefore, Beck's opinion testimony shall not be considered, and Plaintiffs' motion to strike it is **GRANTED.** *See* Fed R. Civ. P. 56(e); Fed. R.Evid. 701, 702.

arrangement used by the City, OCSD collects wastewater generated by residential, commercial, and industrial users within its service area in Orange County, and then treats this wastewater at two treatment plants, where a portion of the wastewater solid residuals are collected, treated further, and reconstituted into biosolids. The biosolids are then reused as a fertilizer and a soil conditioner at Tule Ranch. (*Id.* ¶ 6.) The biosolids OCSD ships to Kern meet the Class A and EQ standards. (Pls'. Ex. 24 [Ghirelli P.I. Decl.] ¶¶ 3, 6–7.)

CSD No 2 collects wastewater from 78 cities and from the unincorporated areas of Los Angeles County located outside the City of Los Angeles. CSD No. 2 treats this wastewater in its 11 treatment plants, and then conveys the solid materials in the wastewater to its Joint Water Pollution Control Plant, where these materials are separated, given additional treatment, and processed into biosolids for beneficial reuse. (DOSSUF ¶ 8.) CSD No. 2 sends its biosolids to Honey Bucket Farms. (*Id.* ¶ 9.)

The record contains far less information about Tule Ranch and Honeybucket Farms than it does concerning Green Acres Nevertheless, no party has contended there is any significant difference between the sites,[5] and indeed, the arrangements are similar in several important respects. At each Kern County location, the City's, OCSD's, and CSD No. 2's

biosolids are used as a nutrient supplement and soil amendment on acreage used to grow animal feed crops. (*Id.* ¶¶ 3, 6, 9.) if the sites in Kern County became unavailable, Plaintiffs would be required to find alternative sites, most probably in Arizona (Pls'. Ex. 18 [Bahr P.I. Decl.] ¶ 9), which would significantly increase transportation costs and impose greater environmental impact from vehicle emissions, both due largely to the increased hauling distances. (Pls'. Ex. 19 [Stahl P.I. Decl.] ¶ 17; Pls'. Ex. 1 [Minimide P.I. Decl.] ¶¶ 32–37.)

### 2. KERN'S BIOSOLIDS

Before the Kern County Board of Supervisors adopted biosolids ordinances in 1999 and 2002, Kern land applied its sewage sludge to an 1,100–acre farm that it owns in the unincorporated areas of the County. (Pls'. Response to Defs' Separate Statement ("PSGI") ¶ 25.) However, Kern does not currently apply any of its own biosolids to Kern farmland, and has not since at least 2004. Instead, the Kern Sanitation Authority currently sends its biosolids to a private contractor, San Joaquin Composting ("SJC"), which processes them further and sells them as compost to private firms. No in-county government entity currently applies biosolids to land in Kern's jurisdiction. (*See* Defs'. Separate Statement in Reply to Pls'. Response to Defs'. Separate Statement SGI ("DRSGI") ¶¶ 105–106.)[6]

5. However, the record includes a December 2006 report authored after an unannounced inspection by an officer of the California Regional Water Quality, which found that Tule Ranch / Honeybucket Farms was not in violation of any regulations, but rated the sites a 3 out 5 for overall facility operations, which indicated they were merely "satisfactory" (Defs'. Ex. 16 [Inspection Report] at 1, 2.)

6. Under Measure E, however, compost sold by SJC could not be applied to land in Kern's jurisdiction, and therefore Kern staffers have expressed some concern that SJC would stop accepting biosolids from Kern. (Pls'. Ex. 9 [McCutcheon Decl.] Ex. A [Memo to Kern Board of Supervisors] at 298–99.) In any event, Kern effectively relies on SJC to sell its biosolids to firms in jurisdictions that will allow land application.

## D. REGULATION OF BIOSOLIDS IN KERN COUNTY

### 1. KERN'S REGULATION OF BIOSOLIDS PRIOR TO MEASURE E

Kern has had two biosolids ordinances prior to Measure E. First, Kern began regulating land application of biosolids in 1998, when it required that the biosolids meet the standards for Class A and Class B biosolids. *County Sanitation Dist. No. 2 of L.A. County v. County of Kern*, 127 Cal.App.4th 1544, 1568, 27 Cal.Rptr.3d 28 (Ct.App.2005) (*"County Sanitation"*). Second, in 1999, Kern adopted an ordinance that phased out the land application of Class B biosolids over a three-year period. And after the three-year phase-out, the 1999 ordinance allowed only Class A EQ biosolids. *Id.* at 1568 n. 34, 27 Cal.Rptr.3d 28; 40 C.F.R. 503.13(b)(3).

### 2. CITIES WITHIN KERN COUNTY

Because the incorporated areas of the County necessarily lie beyond Kern's jurisdiction, Cal. Const. art. XI, § 7, Kern has never regulated the land application of biosolids by the several cities in the County that land apply biosolids on farm land within city limits. These cities include Bakersfield, *see* B.M.C. § 8.90.020(A) (allowing land application of Class A EQ biosolids to city owned or operated farmland), Taft, Wasco, and Delano (Pls'. Ex. 2 [Stockton P.I. Decl.] ¶ 20; Stahl P.I. Decl. ¶ 12 (stating that incorporated areas in Kern County allow Class B biosolids); *see also* Pls.' Ex. 9 [McCutcheon P.I. Decl.], Ex. A at 299 (opining that Measure E could force Kern to find incorporated cities in the County to accept its biosolids for land application)). Nearly 44% of Kern County voters reside in Bakersfield, while only 39% percent reside in unincorporated areas (as of August 2, 2007). *See* http://

elections.co kern.ca.us/ Elections/district-countstatistics.asp (last visited Aug. 2, 2007).[7]

### 3. MEASURE E

#### a. The Campaign

Dubbed the "Keep Kern Clean Ordinance of 2006," Measure E was sponsored by Dean Florez, a State Senator whose district encompasses portions of Kern County, including portions of Bakersfield, and who had previously introduced statewide legislation that would have prohibited local governments from exporting their sewage sludge to other counties unless there were no feasible local disposal option. S.B. 926 (Cal.2005). Indeed, Measure E's initiative campaign made clear that the target was sludge from out-of-county. It included such statements as:

—"Measure E will stop L.A. from dumping on Kern"

—"We will proclaim our independence from polluting Southern California and Los Angeles."

—"[W]e've got a bully next door, flinging garbage over his fence into our yard"

—"A lot of voters are just kind of tired of being the dumping ground for everyone else in the state.... Enough sludge, enough sexual predators, enough prisons, enough dairies. When does the county stand up for itself?"

(Stockton P.I. Decl. ¶ 19; Pls. Ex. 19 [Editorial, Take Your Sludge and Shove It!, Bakersfield Californian] at B–8.) Moreover, the campaign website, http://www.keepkernclean.com, includes graphics that state "Keep L.A. Sludge out of Kern County" and depict stacked outhouses, with the top labeled "LA COUNTY" and the bottom labeled "KERN COUNTY." It also

---

7. The Court takes judicial notice of the Bakersfield Municipal Code and the Kern County voter registration statistics Fed.R.Evid. 201(b)-(d).

contains a link to an online editorial that states:

> Until Kern County voters say *no to sludge* and *YES to Measure E,* every man, woman and child who lives here will have to put up with Southern California dumping its human and industrial waste on us.
>
> Why? Because Kern County is the cheapest place for Southern California to dump the chemical and biological-laced goo that is scraped from the bottoms of its sewer plants.
>
> . . .
>
> Measure E on the June ballot will prohibit the land application of sludge in unincorporated areas of Kern County. Southern California will have to find a better, safer way to dispose of its goo, which contains heavy metals, industrial solvents, feces, medical waste and pharmaceuticals.

http://www.bakersfield.com/135/story/48404.html.

Another link from the campaign website leads to an article that states:

> Fearful of deteriorating air and water quality, many folks in [Kern] county have about had it with the daily parade of trucks dumping sewage sludge onto their fields. On top of that, they can't stand what is viewed as Los Angeles' imperial attitude, such as recent reports that social workers in Los Angeles County had given homeless people one-way bus tickets to Bakersfield, the largest city in Kern County.
>
> In fact, many residents are simply sick of Los Angeles.
>
> . . .
>
> "The valley is home to every one of the 11 prisons built since 1990," . . . . "We have waste-burners and tire-burners and proposals for even more garbage.

> At some point, there's enough critical mass that people say: 'No more. That's not our future.' "[8]

Not surprisingly, on June 6, 2006, the voters of Kern County adopted Measure E with over 83% of the vote. (Pls'. Response to Defs'. Separate Statement of Undisputed Material Facts ("PRSSUF") ¶ 1.)

### b. The Ordinance

Measure E repealed Chapter 8.05 of the Ordinance Code of Kern County and enacted a new Chapter 8.05, which prohibits the land application of all biosolids in the unincorporated areas of Kern County. K.C.O.C. §§ 8.05.10, 8.050.40(A). The ordinance defines "land apply" as "the spraying, spreading or other placement of Biosolids onto the land surface, the injection of Biosolids below the land surface, or the incorporation of Biosolids into the soil." *Id.* § 8.05.030(E).

Excluded from the general ban are biosolid products purchased from retail outlets and used primarily for residential purposes in limited quantities. *See id.* § 8.05.030(B). Violations of the ordinance constitute misdemeanors punishable by fines and imprisonment. *Id.* § 8.05.060.

The stated purpose and intent of Measure E are as follows:

> There are numerous serious unresolved issues about the safety, environmental effect, and propriety of land applying Biosolids or sewage sludge, even when applied in accordance with federal and state regulations. Biosolids may contain heavy metals, pathogenic organisms, chemical pollutants, and synthetic organic compounds, which may pose a risk to public health and the environment even if properly handled. . . . land spreading of biosolids. . may cause loss of confi-

---

**8.** The Court considers these statements not for their truth, but as evidence of the campaign strategy and thereby the voters' intent in enacting Measure E.

dence in agricultural products from Kern County,

*Id.* § 8.05.010.

Measure E is at issue here.

## IV.

## DISCUSSION

### A. THE CROSS MOTIONS FOR SUMMARY JUDGMENT

#### 1. THE LEGAL STANDARD

The Court assesses the motions under the usual standard, which permits entry of judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, the Court must first decide whether there exist "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), If the facts are not in dispute, then the Court determines whether the moving party is entitled to judgment as a matter of law. Further, where summary judgment is not proper on the entire claim, under Rule 56(d) the Court may grant partial summary judgment on discrete elements of the claim. Fed.R.Civ.P. 56(d); *Lies v. Farrell Lines, Inc.,* 641 F.2d 765, 769 (9th Cir. 1981)

"On cross motions for summary judgment, the burdens faced by the opposing parties vary with the burden of proof they will face at trial. When the moving party will have the burden of proof at trial, his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Seagate Tech., Inc. v. St. Paul Fire & Marine Ins. Co.,* 11 F.Supp.2d 1150, 1152

(N.D.Cal.1998). On the other hand, "a moving party who will not have the burden of proof at trial need only point to the insufficiency of the other side's evidence, thereby shifting to the nonmoving party the burden of raising genuine issues of fact by substantial evidence." *Id.*

#### 2. THE EQUAL PROTECTION CLAUSE CLAIM

Plaintiffs claim that Measure E violates the Equal Protection Clause, U.S. Const., amend. XIV, § 1, by treating biosolids differently than other fertilizers, which they claim present equal if not greater public health risks. The Court disagrees and concludes Kern's motion for summary adjudication of this claim has merit.

#### a. Overview of Equal Protection Doctrine

 Where, as here, the classification at issue does not involve fundamental rights or suspect classes, it comports with the Equal Protection Clause "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe,* 509 U.S. 312, 319–20, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). Under rational basis analysis, a "classification 'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.' A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification." *Id.* at 320, 113 S.Ct. 2637 (citations omitted). Indeed, a "legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Id.* (citation omitted). "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Id.* at 321, 113 S.Ct. 2637

(quoting *Metropolis Theatre Co. v. Chicago*, 228 U.S. 61, 69–70, 33 S.Ct. 441, 57 L.Ed. 730 (1913)). Moreover,

[e]vils in the same field may be of different dimensions and proportions, requiring different remedies.... Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.... The prohibition of the Equal Protection Clause goes no further than the *invidious* discrimination.

*F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 316, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (emphasis added). Therefore, under rational basis review:

the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally *may have* been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.

*Nordlinger v. Hahn*, 505 U.S. 1, 11, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) (emphasis added) (citations omitted)

■ Because the rational basis standard requires great deference to legislative judgments, a plaintiff who brings an equal protection claim attacking a regulatory statute like the one at issue in this case bears the burden to negate every conceivable basis that might support the challenged statute. *Beach Comm'ns*, 508 U.S. at 315, 113 S.Ct. 2096. A plaintiff may carry this burden by demonstrating that the defendant's proffered purposes were merely pretextual. This may be accomplished when confronted with a defense motion for summary judgment by "creating a triable issue of fact that either: (1) the proffered rational basis was *objectively* false; or (2) the defendant *actually* acted based on an improper motive."

*Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 946 (9th Cir.2004) (emphases added) (citations omitted); *see also, e.g., Armendariz v. Penman*, 75 F.3d 1311, 1327 (9th Cir.1996) (plaintiffs "raised a triable issue of fact as to whether the [City's] asserted rationale of directing efforts to enforce the housing code at high-crime areas was merely a pretext" for obtaining their property at low prices). As the Court explains below, nothing in this record suggests that the justifications for the enactment of Measure E were pretextual.

### b. Analysis

#### i. Measure E's Stated Purposes Were Not Pretextual and Were Legitimate

■ Here, Measure E recites a variety of legitimate purposes, including a generalized concern for health and safety, nuisance abatement from unpleasant odors associated with biosolids, and protection of the "confidence" in agricultural products from Kern County. K.C.O.C. § 8.05.010. And contrary to Plaintiffs' contention (Opp. at 11–13), no evidence indicates that these stated purposes were pretextual even though the campaign in favor of Measure E appears to have played on regional rivalries and was clearly targeted at Plaintiffs, as it involved a variety of creative slogans referring to "LA. sludge." (*See* Stockton P.I. Decl. ¶ 19; Pls. Ex. 19 [Editorial, Take Your Sludge and Shove It!, Bakersfield Californian] at B–8.) Nothing in these statements indicates a *bare* desire to harm Plaintiffs unrelated to the environmental harms they were perceived to be causing and which Kern could legitimately redress. Rather, the statements merely reflect an indisputable fact—that Southern California counties were the ones introducing the perceived pollutant to Kern's jurisdiction. Put simply, although the campaign indicated frustration and

even animosity towards Plaintiffs, these feelings were directly related to Measure E's stated environmental purposes. Thus, though animus may have been a significant element of the campaign, that fact alone does not establish a violation of the Equal Protection Clause. As the Supreme Court has explained: "Although such biases [as negative attitudes and fear] may often accompany irrational (and therefore unconstitutional) discrimination, their presence alone does not a constitutional violation make." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 367, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001).

In short, Measure E sought to address perceived pollution, and Plaintiffs were perceived polluters. Even the campaign references to sexual predators and prisons were mere rhetoric to illustrate that, in the view of the campaign, sludge was something harmful to the County that was introduced by outsiders. For that reason, the campaign rhetoric does not reasonably lead to the inference that Measure E's stated environmental purpose was a pretext to conceal some other, unconstitutional, objective.

### ii. Measure E Rationally Furthers Its Stated Purposes

If one considers the scope and impact of Measure E apart from the campaign rhetoric, one can readily determine that it is rationally related to its purposes. Measure E's drafters and supporters could rationally speculate that land application of biosolids would present unknown future health risks that would be avoided by banning the practice. They also could properly be concerned that the reputation of Kern's agricultural products would be ad-

versely affected if the County became known as a dumping ground for the refuse of Southern California residents. Indeed, a 1996 NRC study states that adverse public perception of the use of sewage sludge in food crop production is a serious problem and that "public perception does not necessarily depend on objective, scientific evidence." (Defs'. Ex. 20 at 158–59.) The 1996 NRC study also stated:

[T]he major business risk for farmers and food processors . . . is stigmatization of the product and its source. This leads to loss of customer confidence, choice of competing products, and loss of market share on regional and even national scales. Even if contamination or injury causation is unproved, these consequences may occur because widespread media coverage, speculations, or allegations may be enough to make the retailers and consumers reject the product.

(*Id.* at 171.)

The NRC study also concluded that "the risks from negative public perception could be substantial. Negative public perception of food crops produced using treated wastewater or sludge could have detrimental impacts on consumer demand and the profit and survival of firms." (*Id.* at 160.) [9]

Plaintiffs object to the above evidence, contending that because their biosolids are applied on acreage used only to grow animal feed, concerns related to food for human consumption are irrelevant. The objection misses the point. Evidence concerning public perception regarding food products confirms (as if it needed confirming) that factors other than scientific realities frequently affect the public's beliefs

---

**9.** Kern also contends that major food processors such as Heinz U.S.A. and Del Monte do not accept agricultural products grown on soil treated with sewage sludge. Its evidence in support of this purported fact, however, is correspondence to a paralegal that works for defense counsel. Therefore, the evidence must be disregarded as without foundation and inadmissible hearsay.

about its food supply. Since perception can become reality for those involved in agri-business, Kern could rationally conclude that a complete ban on the land application of biosolids with its jurisdiction rationally furthers Kern's agricultural reputation. Thus, even if Plaintiffs themselves do not grow food for human consumption, that fact alone would not render Measure E irrational as applied to them. Rather than adopting a potentially cumbersome program to ensure that no crops grown with biosolids are used for human consumption, Kern may simply have preferred not to incur the risks of being associated with biosolids at all. The choice to enact a blanket ban was not irrational.[10]

Finally, the record also includes evidence that some problems, including the potential for offensive odors, cannot be eliminated even at the "best run" biosolid disposal operations. (Defs'. Ex. 19 [1999 EPA Report: Biosolids Generation, Use, and Disposal in the United States] at 41.) This confirms that Measure E rationally furthered its stated purpose of avoiding nuisances associated with biosolids.

For these reasons, Measure E comports with the Equal Protection Clause, notwithstanding a variety of evidence in the record that biosolids present only negligible risks to human health when applied in conformity with federal regulations. As the Supreme Court has emphasized, a "legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Heller*, 509 U.S. at 320, 113 S.Ct. 2637 (citation omitted). This means that, for Equal Protection purposes, Kern voters were not obligated to make a decision based on cutting edge research: Measure E comports with the Equal Protection Clause unless it was *irrational*, and on this record, it was not.

Therefore, Kern's motion for summary judgment on the Equal Protection claim is **GRANTED**.

### 3. THE COMMERCE CLAUSE CLAIM

Plaintiffs' Commerce Clause claim fares better, largely because they have carried their burden to demonstrate Measure E's effect of discriminating against interstate commerce, thereby subjecting the ordinance to strict scrutiny which it cannot survive.

### a. Overview of the Dormant Commerce Clause

 The Commerce Clause, U.S. Const. art. I, § 8, cl. 3, affirmatively grants Congress plenary power to regulate

---

**10.** Plaintiffs purport to controvert the claimed purpose of guarding Kern's agricultural reputation with a report from the California State Water Resources Control Board that stated "[W]ith respect to the use of biosolids in the production of food crops [California farmers] are at no marketing disadvantage with respect to any other agricultural region in the U S or the world." (Pls'. Ex. 12 [State Water Resources Control Board, Final Statewide Program EIR Covering General Waste Discharge Requirements for Biosolids Land Application (July 2004)] at 2–81.) The reason this was so, however, was simply that "No state within the U.S. bans the application of biosolids to food crops. Further, the land application of biosolids to agricultural lands producing food crops is a common practice in many areas of the world that also import food crops to the U.S." (*Id.*) Therefore, far from concluding that the public was *unconcerned* with biosolids, the State Board merely concluded that with most sources of food coming from regions that used biosolids, all growers were essentially on a level playing field when viewed in the abstract. The report made no findings with respect to regions that experienced particularly high concentrations of biosolid application, or that became notorious for the practice Therefore, the report does not negate the rationality of the belief that Kern agricultural products could suffer if the County continued to be used for biosolids

commerce and limits the power of states and local government to adopt ordinances that interfere with interstate commerce, even "[w]hen legislating in areas of legitimate local concern, such as environmental protection and resource conservation." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981). Because Congress has absolute authority in the regulation of commerce, it may legislatively exempt local ordinances from the Commerce Clause's restrictions. "Where state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce." *White v. Mass. Council of Constr. Employers, Inc.*, 460 U.S. 204, 213, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983) (quoting *S. Pac. Co. v. Arizona*, 325 U.S. 761, 769, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945)). However, Supreme Court precedent teaches that such authorization must be clearly expressed by Congress, and in the absence of such a clear expression courts should not assume Congress has authorized a discriminatory or burdensome local regulation. *Hillside Dairy Inc. v. Lyons*, 539 U.S. 59, 66, 123 S.Ct. 2142, 156 L.Ed.2d 54 (2003).

■ Where the Commerce Clause does apply, the level of scrutiny depends on whether the ordinance at issue "discriminates" against interstate commerce. "[L]aws that discriminate against interstate commerce face 'a virtually per se rule of invalidity.'" *Granholm v. Heald*, 544 U.S. 460, 476, 125 S.Ct. 1885, 161 L.Ed.2d 796 (2005) (quoting *Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978)). Because of this "virtually per se rule," precedent dictates that discriminatory statutes should be subjected to strict scrutiny and should be upheld "only if the government can demonstrate both that the law serves a legitimate local purpose and that this purpose could not be served as well by available nondiscrimina-

tory means." *Maine v. Taylor*, 477 U.S. 131, 138, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986). "'[D]iscrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Or. Dep't of Envtl. Quality*, 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994).

By contrast, laws that do not discriminate against interstate commerce face a more deferential standard. Under the so-called "*Pike* test," "nondiscriminatory regulations that have only incidental effects on interstate commerce are valid unless 'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Id.* (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)).

### b. Application

#### i. Biosolids Are Articles in Interstate Commerce

■ A local government's regulation of waste and waste disposal constitutes "regulation of interstate commerce" where the regulation's economic effects are interstate in reach. *E.g., C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S., 383, 389, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994); *see also Conservation Force, Inc. v. Manning*, 301 F.3d 985, 993 (9th Cir. 2002) ("To determine whether the dormant Commerce Clause is applicable, we ask ... whether the activity regulated ... has a 'substantial effect' on interstate commerce such that Congress could regulate the activity."). Here, the record reflects that disposal sites for biosolids are relatively scarce (Pls'. Ex. 19 [Stahl P.I. Decl.] ¶ 16), and that elimination of the sites in Kern County, California will likely lead to diversion of the material to Arizona (*id.* ¶ 16; Pls'. Ex. 1 [Minimide P.I. Decl.] ¶ 9). This suffices to bring Measure E within the

ambit of the Commerce Clause. *See, e.g., C & A Carbone,* 511 U.S. at 389, 114 S.Ct. 1677.

■ Although *C & A Carbone* involved a restriction that barred out-of-state waste haulers from bringing refuse across state lines, Kern's status as a county and not a state does not render the Commerce Clause inapplicable. "[A] State (or one of its political subdivisions) may not avoid the strictures of the Commerce Clause by curtailing the movement of articles of commerce through subdivisions of the State, rather than through the State itself." *Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Natural Res.,* 504 U.S. 353, 361, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992); *see also Dean Milk Co. v. Madison,* 340 U.S. 349, 354–56, 71 S.Ct. 295, 95 L.Ed. 329 (1951) (invalidating an ordinance that barred certain milk producers from selling milk within city limits); *BFI Med. Waste Sys. v. Whatcom County,* 983 F.2d 911, 913 (9th Cir.1993) (citing *Fort Gratiot* for the proposition that "out-of-county waste bans are per se unconstitutional"). Indeed, discrimination against out-of-county entities would, a fortiori, discriminate against out-of-state entities and therefore be subject to the virtual per se rule of invalidity.

### ii. Congress Has Not Exempted Measure E From Commerce Clause Limitations

■ Kern argues vigorously that Measure E is immune from attack under the Commerce Clause because Congress has specifically authorized local regulations of biosolids. (Defs'. Mot. at 2–9; Defs'. Reply at 1–4.) In support, Kern cites a provision in the Clean Water Act, which provides:

The determination of the manner of disposal or use of sludge is a local determination, except that it shall be unlawful for any person to dispose of sludge from a publicly owned treatment works or any other treatment works treating domestic sewage for any use for which regulations have been established pursuant to subsection (d) of this section, except in accordance with such regulations.

33 U.S.C. § 1345(e).

■ The legislation, properly construed and understood, provides no support of Kern's position. As the Court has explained twice previously, *Kern I,* 2006 WL 3073172, at *7; *Kern II,* 462 F.Supp.2d at 1113, section 1345(e), though contemplating local legislation regarding sludge disposal, contains no language remotely approaching authorization of local legislation that discriminates against or unduly burdens interstate commerce. As already noted, congressional approval for local regulation in general does not render the Commerce Clause inapplicable. *See South–Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 91–92, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984). Rather, the question is whether Congress has made unmistakably clear its intent to "remove federal constitutional constraints" and thereby "sustain state legislation from attack under the Commerce Clause." *Sporhase v. Nebraska, ex rel. Douglas,* 458 U.S. 941, 959–60, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982). As the Court in *Maine v. Taylor* explained:

[B]ecause of the important role the Commerce Clause plays in protecting the free flow of interstate trade, this Court has exempted state statutes from the implied limitations of the Clause only when the congressional direction to do so has been unmistakably clear.... Maine identifies nothing ... that suggests Congress wished to validate state laws that would be unconstitutional without federal approval.

477 U.S. at 138–39, 106 S.Ct. 2440 (citation and internal quotation marks omitted); *see also Hillside Dairy,* 539 U.S. at 68, 123

S.Ct. 2142 ("Because § 144 does not clearly express an intent to insulate California's pricing and pooling laws from a Commerce Clause challenge, the Court of Appeals erred in relying on § 144 to dismiss the challenge."); *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 155 n. 21, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) (holding that Congress had "convincingly" though not "expressly" "announced that Indian taxes do not threaten its latent power to regulate interstate commerce"). Because Kern cites no such expression of congressional intent here, the Commerce Clause analysis applies to the Court's consideration of Measure E.[11]

### iii. Measure E's Effect Is To Discriminate Against Interstate Commerce, And It Cannot Survive Strict Scrutiny

■ Having concluded that Congress has not exempted Measure E from Com-

merce Clause analysis, the Court begins by noting that Measure E does not discriminate on its face; by its terms, it bans all biosolids regardless of their origin. *See* K.C.O.C. §§ 8.04.040(A), 8.05.050(A), 8.05.060. However, even absent facial discrimination, a court may find that a state law violates the Commerce Clause on proof either of discriminatory effect, or of discriminatory purpose. *Minnesota,* 449 U.S. at 471 n. 15, 101 S.Ct. 715. Based on that proposition, Plaintiffs contend that, despite Measure E's facial neutrality, it nonetheless transgresses the Commerce Clause because its underlying purpose and effect is to discriminate against biosolids from the City and other Southern California communities. (Pls'. Opp. at 6.) The Court previously found Plaintiffs were likely to prevail with this position, *Kern II,* 462 F.Supp.2d at 1113–15, and, upon careful consideration, now holds that they have done so.

11. Kern unpersuasively argues that Measure E is not subject to such analysis, citing *Western & Southern Life Insurance Co. v. State Bd. of Equalization,* 451 U.S. 648, 653–54, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981) for the proposition that congressional approval or authorization of a local regulation in general suffices to immunize an ordinance from a Commerce Clause attack. But that case does not support Kern's position either, as the Court there concluded Congress had authorized discriminatory state insurance regulations in large part because of a statutory provision stating:

Congress declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, *and that silence on the part of the Congress shall not be construed to impose any barrier* to the regulation or taxation of such business by the several States.

*Id.* at 653, 101 S.Ct. 2070 (citing 15 U.S.C. § 1011) (emphasis added). Moreover, the Court also noted that Congress had enacted the legislation in question—the McCarran–Ferguson Act—in the wake of a Commerce Clause case that overruled prior jurisprudence to hold that insurance was "com-

merce" and thus subject to Commerce Clause analysis in the first instance *Id.* at 654–55, 101 S.Ct. 2070. Therefore, contrary to Kern's suggestion, *Western & Southern Life Insurance* is merely another example of the Supreme Court demanding convincing evidence of Congressional intent to allow local legislation that would otherwise transgress the Commerce Clause before it will deem the Commerce Clause analysis inapplicable. To the same effect, and unhelpful to Kern for similar reasons, is *Northeast Bancorp, Inc. v. Bd. of Governors,* 472 U.S. 159, 174, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985), which also inquired into Congress' intent to allow *discriminatory* state regulations. Even less helpful is *Oxygenated Fuels Ass'n, Inc. v. Davis,* 331 F.3d 665, 666 (9th Cir.2003), which merely held that a California regulation banning MTBE in gasoline was not preempted by the Clean Air Act and in no way involved Commerce Clause analysis. Kern is therefore left only with the district court's opinion in *Oxygenated Fuels Ass'n, Inc. v. Davis,* 163 F. Supp 2d 1182, 1188 (E.D.Cal.2001), which, though reaching a result consistent with the position Kern advocates, provided no analysis that addressed the Supreme Court authority cited above, and thus is unpersuasive

Even though for Equal Protection purposes the antagonism toward Los Angeles in particular and Southern California in general fails to negate a legitimate environmental concern about the land application of biosolids within Kern County, Commerce Clause jurisprudence focuses on a different set of concerns—the discriminatory impact of the legislation on commerce or articles in commerce. In that regard, one cannot ignore the campaign rhetoric, which included such statements as "Measure E will stop L.A. from dumping on Kern" and "[W]e've got a bully next door, flinging garbage over his fence into our yard." While these sorts of statements do not suggest that Measure E was enacted for the purpose of protecting local industry at the expense of outside businesses, they amply demonstrate that the initiative was not so subtly animated by a specific desire to exclude Plaintiffs' biosolids from the County.[12] And while excluding Plaintiffs' biosolids from disposal in the County, Measure E has virtually no impact on in-county biosolid programs, as Kern's biosolids could continue to be shipped to SJC, and cities in the County were permitted to continue to allow land application within their corporation limits.

In these circumstances, the record compels only one conclusion: Measure E's drafters and proponents, though perhaps genuinely motivated by concern about the environmental impact of biosolids, reacted to this problem by banning land application in areas used by out-of-county entities, while tolerating it in areas used by in-county entities. This resulting disparity was not merely an incidental effect—rather, it was certainly intended, as evidenced by a campaign with the theme of independence from Southern California bullies. Having reached this conclusion, it follows that Measure E must be subjected to strict scrutiny not because of an illegitimate purpose, *Minnesota,* 449 U.S. at 463, 471 nn. 7, 15, 101 S.Ct. 715 (presence of genuine environmental purpose precludes application of strict scrutiny on purpose grounds), but rather because the legislation was intended to and does have a discriminatory effect. *See Spoklie v. Montana,* 411 F.3d 1051, 1060 (9th Cir.2005) (noting that the rule of strict scrutiny for Commerce Clause claims applies "where legislation results in 'patent discrimination against in-

12. Kern cites California law for the proposition that the campaign rhetoric here is irrelevant to the voters' intent because it was not part of the official ballot materials. (Defs' Rebuttal at 4–5.) However, Kern's California authorities are distinguishable because they concern reluctance to resolve *statutory ambiguities* by looking to materials not before the voters *See In re First Trust Deed & Investment, Inc.,* 253 F.3d 520, 530 (9th Cir.2001) (under California rule of statutory construction, courts may not "consider the motives or understandings of an individual legislator even if he or she authored the statute"), *Horwich v. Superior Court,* 21 Cal.4th 272, 277 n. 4, 87 Cal.Rptr.2d 222, 980 P.2d 927 (1999) (declining to resolve ambiguity in Proposition 213 by looking to "matters [that] were not directly presented to the voters"); *Robert L. v. Superior Court,* 30 Cal.4th 894, 904–05, 135 Cal. Rptr.2d 30, 69 P.3d 951 (2003) (same, citing

*Horwich* ). Here, the campaign rhetoric was assuredly before the voters (as it was disseminated on the internet on the campaign website and reflected on the websites of mainstream media), and is relevant here not to resolve an ambiguity, but to assess voters' *potentially wrongful intent*—a use adopted by controlling Supreme Court authority which, contrary to Kern's suggestion, cannot be limited to the Equal Protection context. *Washington v. Seattle Sch. Dist. No. 1,* 458 U.S. 457, 471, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982). Indeed, at least one federal court of appeals has, in a dormant Commerce Clause case, been willing to assess the intent of a local ordinance by looking directly to the intent of its drafters. *S.D. Farm Bureau, Inc. v. Hazeltine,* 340 F.3d 583, 596 (8th Cir.2003). The Court finds this approach persuasive here as well.

terstate trade.'" (quoting *Philadelphia*, 437 U.S. at 624, 98 S.Ct. 2531)). Although the circumstances presented in this case are out of line with the more usual pattern of discrimination in Commerce Clause jurisprudence, Measure E must be tested under the strict scrutiny standard because the legislation plainly discriminates, and was intended to discriminate, against out-of-county sludge.

To circumvent this analysis, Kern argues that Measure E regulates entirely even handedly within the unincorporated areas of the County. (Defs'. Reply at 7–8.) The argument ignores reality: out-of-county interests are the only ones directly applying biosolids to land in the unincorporated areas, and therefore they will be the only ones to incur the significant transaction costs associated with the termination and relocation of their Kern County operations. (*See* Pls'. Ex. 18 [Bahr P.I. Decl.] ¶ 11 (noting costs required to initiate a new biosolids program).) No city within the County applies biosolids to land in the unincorporated areas, and Kern itself sends its biosolids to SJC. (DRSGI ¶¶ 105–106.) Although the application of the biosolids ban to SJC's compost presents some threat to Kern's current disposal method (Pls'. Ex. 9 [McCutcheon Decl.] Ex. A [Memo to Kern Board of Supervisors] at 298–99), the SJC arrangement insulates Kern in an important way from Measure E's burdens, as Kern can continue sending its material there so long as SJC finds enough buyers in neighboring jurisdictions. As a result, even confined to the unincorporated areas of the County, Measure E's burdens fall significantly heavier on Plaintiffs than they do on Kern.

Second, and more importantly, the Court cannot ignore the fact that incorporated cities within Kern County continue to allow land application of biosolids, in some cases of lesser quality that Plaintiffs'. This, coupled with the overwhelming evidence of intent to exclude out-of-county sludge from the County as a whole, compels the conclusion that Measure E has the practical effect of allowing Kern County municipalities to continue applying their biosolids within the County's borders, but preventing out-of-county jurisdictions from doing so. It may not be appropriate to consider the extra-jurisdictional effects of legislation in every case, but ignoring the conduct of Kern County municipalities would impose an artificiality on the analysis that would undermine the very purpose of long-standing Commerce Clause jurisprudence. This is especially true in this case where the record reflects that nearly 61 % of Kern County's registered voters live in incorporated areas of the County. This means that over three-fifths of the decision-makers tolerate local disposition of locally generated biosolids, but have prevented out-of-county recyclers from engaging in precisely the same activity by banning the operation of any biosolid recycling facilities in the unincorporated areas of the County. This constitutes a discriminatory effect far too conspicuous to hide behind the jurisdictional limits of Kern itself. *Cf., e.g., Healy v. Beer Inst.*, 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) (holding that courts must consider the practical effect of the law, including how it interacts with the laws of other jurisdictions, in considering the Commerce Clause analysis); *Valley Bank of Nev. v. Plus Sys., Inc.*, 914 F.2d 1186, 1190 (9th Cir.1990) (same, citing *Healy*). And as the Supreme Court noted in *United Haulers Ass'n, Inc. v. Oneida–Herkimer Solid Waste Authority.*

Our dormant Commerce Clause cases often find discrimination when a State shifts the costs of regulation to other States, because when the burden of state regulation falls on interests outside the state, it is unlikely to be alleviated by the operation of those political re-

straints normally exerted when interests within the state are affected. —— U.S. ——, 127 S.Ct. 1786, 1797, 167 L.Ed.2d 655 (2007); *see also Maine*, 477 U.S. at 149 n. 19, 106 S.Ct. 2440 (explaining that the Commerce Clause does not allow locales to further legitimate environmental purposes by forcing outsiders to "bear the brunt of the conservation program for no apparent reason other than that they lived and voted in other" jurisdictions). That is what happened here. Measure E shifts the costs resulting from its regulation almost entirely to out-of-county interests through an initiative process that was unchecked by the operation of the normal political restraints, such as an organized local opposition. The Supreme Court teaches that this sort of discriminatory legislation transgresses the dormant Commerce Clause absent the most persuasive local justification.

Kern may protest that, even viewed from the perspective of the County as a geographical region and not simply as a political entity, Measure E has no discriminatory effect because Plaintiffs would be free to land-apply biosolids in incorporated areas of the County. While tempting, this position would require the Court to ignore undisputed evidence in the record. First, it is undisputed that Measure E's likely effect is to cause Plaintiffs to ship their biosolids to Arizona. While the record does not foreclose the possibility that Plaintiffs could simply use land in their own jurisdictions, their undisputed willingness to accept the greater distance to Arizona leads only to the inference that they could not simply resort to the incorporated areas of the County.

Moreover, Kern itself submitted a staff report opining that, should Measure E cause SJC to stop accepting Kern biosolids, Kern could be in the position of having to "[f]ind an incorporated city in the County that would accept [Kern] generated biosolids." (Pls'. Ex. 9 [McCutcheon Decl.] Ex. A [Memo to Kern Board of Supervisors] at 299.) The expression of this concern suggests that the cities themselves exercise some de facto control over imports, which, in combination with the anti-Los Angeles rhetoric, suggests they would not accept Plaintiffs' biosolids, thereby leading to a County-wide import ban in practical effect.

But even more significant evidence of Measure E's intended effect comes from the campaign materials: Measure E would assertedly kick Los Angeles sludge out of Kern County. Indeed, it would be strange to think that residents of the County would tolerate Los Angeles "dumping" on its more densely populated incorporated areas when they objected so strongly to the affront to their unincorporated areas. Therefore, the Court must take the rhetoric at face value. Given the overwhelming evidence that excluding "L.A. sludge" from the County was the campaign's intent, the only reasonable inference is that Measure E would force Plaintiffs' operations out of the County entirely and not merely divert them to incorporated areas.

By contrast, no evidence indicates Plaintiffs could use incorporated areas for their biosolids programs. Thus, the Court finds that Measure E Plaintiffs have established Measure E's discriminatory effect as a matter of law, and therefore that Measure E must satisfy strict scrutiny. *E.g., United Haulers*, 127 S.Ct. at 1793.

Strict scrutiny means Measure E violates the Commerce Clause unless Kern can demonstrate it was the only available means to address its legitimate environmental concerns. *Id.* Kern makes no attempt to do so, and on this record, alternatives certainly exist. Rather than a complete ban on biosolids, Kern could simply have regulated the volume, location, and quality of the biosolids it allowed to be

land applied. Kern offers no argument why such methods would have been infeasible or inadequate to address its concerns, and therefore it cannot carry its burden to defend Measure E against strict scrutiny.

Accordingly, the Court holds Measure E violates the Commerce Clause, and therefore Plaintiffs motion for summary judgment on this claim is **GRANTED** and Kern's is **DENIED.**

### 4. THE CIWMA PREEMPTION CLAIM

Plaintiffs also claim that Measure E is preempted by the CIWMA. Kern defends against this theory by contending Plaintiffs lack standing to raise it, and that even if they had standing, CIWMA does not preempt Measure E. The Court disagrees and concludes Plaintiffs are entitled to summary adjudication on this cause of action.

### a. Standing

Parties invoking federal courts' jurisdiction bear the burden to demonstrate a "case or controversy" within the meaning of Article III of the United States Constitution. *E.g., City of Los Angeles v. Lyons,* 461 U.S. 95, 101, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Standing is an essential component of the case or controversy requirement, *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), is required with respect to each form of relief sought, *Lewis v. Casey,* 518 U.S. 343, 358–59 n. 6, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), and is a hurdle that, contrary to Defendants' suggestion, Plaintiffs easily clear here.

 The core constitutional components of standing are (1) an injury in fact (2) that is fairly traceable to the action complained of (3) such that the relief sought would likely redress the injury. *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130; *see also Lyons,* 461 U.S. at 107 & n. 8, 103 S.Ct. 1660 (plaintiff seeking injunctive re-

lief must establish likelihood of *future* injury). Kern erroneously contends that Plaintiffs fail to make this showing. It is undisputed that the government Plaintiffs currently (and have since the mid 1990s) applied their biosolids to land within Kern County. Their ability to do so in the future would be effectively eliminated should Measure E be enforced, because the private Plaintiffs which administer their biosolids programs would face fines and imprisonment for violating the ordinance. *See* K.C.O.C. § 8.05.60. Moreover, Kern has made no suggestion that it does not intend to enforce the overwhelmingly popular ordinance. As a result, *each* Plaintiff has shown the risk of an imminent injury, fairly traceable to enforcement of Measure E, that would be redressed (i.e., prevented) by an order declaring the ordinance invalid and enjoining its enforcement. *Cf. Kern II,* 462 F.Supp.2d at 1119–21 (concluding that each Plaintiff established irreparable harm for purposes of the preliminary injunction analysis). This showing far exceeds Article Ill's minimum requirement, as the presence in a suit of *even one* party with standing is sufficient to make a claim justiciable. *E.g., Dep't of Commerce v. U.S. House of Representatives,* 525 U.S. 316, 330, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999).

Kern also argues that, as to their CIWMA claim, Plaintiffs fail to meet the prudential standing requirement that their complaint fall within the "zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *E.g., Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Kern's contention rests on the argument that Plaintiffs have not shown that their biosolid programs in Kern County are included in their or their host jurisdictions' integrated waste management plans, which are documents man-

dated by the CIWMA *See* Cal. Pub. Res. Code §§ 40900, 41000, 41300. According to Kern, this means that Plaintiffs have not established that their biosolids programs fall within CIWMA's coverage, and thus that Measure E does not invade any interest of Plaintiffs that is protected by the CIWMA. (Defs'. Opp. at 6.) [13]

Again, however, Kern's argument misses the mark. Although Plaintiffs take the bait and respond by insisting that the CIWMA does cover their conduct, the proper inquiry is not whether Plaintiffs' claims are within the zone of interest of the *CIWMA,* because they bring no claim arising under that statute itself. Rather, their CIWMA preemption claims invoke *the California Constitution,* which provides: "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." Cal. Const., art. XI, § 7 (emphasis added).[14] As discussed in greater detail below, this constitutional provision operates in a manner analogous to the federal constitution's Supremacy Clause, U.S. Const. art. VI, cl. 2, preempting local legislation that either expressly or impliedly conflicts with state statutes. *Compare, e.g., Morehart v. County of Santa Barbara,* 7 Cal.4th

725, 29 Cal.Rptr.2d 804, 817–18, 872 P.2d 143 (1994) (listing ways that state law can preempt local ordinances), *with Mich. Canners & Freezers Ass'n, Inc. v. Agric. Mktg. & Bargaining Bd.,* 467 U.S. 461, 469, 104 S.Ct. 2518, 81 L.Ed.2d 399 (1984) (listing ways that federal law can preempt state law). In part, by restricting the power of cities and counties, Article XI, § 7 guarantees that individuals and entities in California will be subject only to local laws consistent with the will of the state legislature and constitutional framers, and thereby effectuates a fundamental aspect of California's republican form of government. It follows, therefore, that Article XI, § 7's "zone of interest" encompasses claims by plaintiffs whose conduct would be restricted by a local ordinance they challenge as preempted, even if the plaintiffs do not assert rights protected by the preempting statute itself. *Cf. Indian Oasis–Baboquivari Unified Sch. Dist. No. 40 v. Kirk,* 91 F.3d 1240, 1260 (9th Cir. 1996) (Reinhardt, J., dissenting) (disagreeing with panel majority that student plaintiffs lacked a particularized injury, and further arguing that they brought claims that were "arguably within the zone of interests of ... the Supremacy Clause, as they challenge[d] the enforcement of an

---

13. Kern also suggests that the Plaintiffs' purported failure to create proper integrated waste management plans means that Plaintiffs cannot demonstrate an injury in fact. (Defs'. Opp. at 6) This argument is perplexing, without authority, and appears merely to conflate the injury in fact inquiry with the prudential "zone of interest" inquiry. Kern also attempts to inject this argument into the substantive preemption analysis (*see* Defs' Mot. at 21–22), as it contends. "Since Plaintiffs have elected not to bring their land application of biosolids in Kern County within the [CIWMA]'s purview, the Act does not preempt or conflict with Measure E" (*Id.* at 22.) To state this argument is essentially to refute it: the contention fails because once Plaintiffs have established standing, the CIWMA claim is essentially a straightforward exercise in statuto-

ry interpretation, and in no way turns on the particular conduct in which Plaintiffs engage.

14. At oral argument, counsel for Kern protested that Plaintiffs' Complaint relied only on the CIWMA and did not mention the California Constitution, and therefore that the relevant zone of interest is CIWMA's. Kern reads the Complaint too narrowly. Plaintiffs clearly alleged that Measure E "is preempted because it conflicts with the purposes and policies of the [C]IWMA" (Compl. ¶ 103.) By alleging that Measure E was preempted by state law, Plaintiffs implicitly invoked the provision of the State Constitution that requires local law to conform to statewide enactments. This suffices to bring Plaintiffs' claim within the zone of interest of Cal. Const, art. XI, § 7.

assertedly preemptive state law"); *Pharm. Research & Mfrs. of Am. v. Concannon,* 249 F.3d 66, 72–74 (1st Cir.2001) ("[In] a preemption-based challenge under the Supremacy Clause ... it is the interests protected by the Supremacy Clause, not by the preempting statute, that are at issue."); *St. Thomas–St. John Hotel & Tourism Ass'n v. Virgin Islands,* 218 F.3d 232, 241 (3d Cir.2000) ("a state or territorial law can be unenforceable as preempted by federal law even when the federal law secures no individual substantive rights for the party arguing preemption"); *ANR Pipeline Co. v. Okla. Corp. Comm'n,* 860 F.2d 1571, 1579 (10th Cir.1988) (holding that plaintiffs whose conduct was subject to allegedly preempted state laws asserted claims that fell "within the zone of interest protected by the Supremacy Clause"); *see also Taubman Realty Group Ltd. P'ship v. Mineta,* 320 F.3d 475, 481 n. 3 (4th Cir. 2003) (positing in dicta that the plaintiff "does not have to meet the additional standing requirement involving the zone of interests test with respect to its Supremacy Clause claim").

Accordingly, Plaintiffs have established the core constitutional components of standing, and no prudential limitation prohibits them from claiming that Measure E is preempted by the CIWMA.

The Court now turns to the merits of that claim.

### b. Preemption by the CIWMA

Plaintiffs contend Measure E is preempted because it thwarts the CIWMA's express purpose of promoting recycling of wastes such as biosolids before other methods of disposal. The Court previously agreed with Plaintiffs in ruling on the motion to dismiss and the motion for the preliminary injunction, and it does so again.

### i. Overview of State Preemption Principles

■ As mentioned above, the preemption analysis under state law is analogous to that under federal law. A county or city may only make and enforce ordinances and regulations that are "not in conflict with general laws." Cal. Const. art. XI, § 7. "Local legislation in conflict with general law is void. Conflicts exist if the ordinance duplicates, ***contradicts,*** or enters an area fully occupied by general law, either expressly or by legislative implication." [15] *Morehart v. County of Santa Barbara,* 7 Cal.4th 725, 747, 29 Cal.Rptr.2d 804, 872 P.2d 143 (1994) (citations and quotation marks omitted, emphasis added).

---

**15.** The *Morehart* court uses the term "by legislative implication" somewhat imprecisely here. California cases use "preemption by implication" to mean "field preemption;" that is, the preemption that occurs when a "subject is so completely covered by general law that it clearly has become exclusively a matter of state concern" *City of Dublin v. County of Alameda,* 14 Cal.App.4th 264, 276, 17 Cal. Rptr.2d 845 (Ct.App.1993). In other words, "preemption by implication" does not mean the opposite of "express preemption," which is how the *Morehart* court seems to use it. *Morehart* means only that, for example, a local ordinance purporting to set a minimum drinking age lower than the state's is "impliedly preempted" even if the state statute does not expressly prohibit local ordinances from lowering the minimum Such a local ordinance would be "impliedly preempted" even though it were not "preempted by implication" The distinction is important, because as in its motion to dismiss, much of Kern's briefs here cite case law addressing the narrow circumstances in which California will find "preemption by implication" (i.e., field preemption). (Defs'. Opp at 16–17; Defs'. Mot. at 14–15) (citing *City of Dublin,* 14 Cal. App.4th at 276, 17 Cal.Rptr.2d 845; *Waste Res. Techs. v. Dep't of Pub. Health,* 23 Cal. App.4th 299, 307, 28 Cal.Rptr.2d 422 (Ct.App. 1994)). These rules are inapposite because Plaintiffs concede that Measure E is not subject to field preemption and instead merely assert conflict preemption.

"Local legislation is 'contradictory' to general law when it is inimical thereto." *Sherwin–Williams Co. v. City of Los Angeles,* 4 Cal.4th 893, 898, 16 Cal.Rptr.2d 215, 844 P.2d 534 (1993).

The party claiming that general state law preempts a local ordinance has the burden of demonstrating preemption. *Big Creek Lumber Co. v. County of Santa Cruz,* 38 Cal.4th 1139, 1149, 45 Cal.Rptr.3d 21, 136 P.3d 821 (2006).

#### ii. Application

##### (1). The CIWMA Preempts Measure E

 When enacted in 1989, the CIWMA required local governments to adopt waste management plans to divert 25% of the solid waste produced in their jurisdictions from landfills by 1995 and 50% by 2000. Cal. Pub. Res.Code § 41780. Additionally, the CIWMA provides:

> In implementing this division, the board and local agencies **shall** do both of the following:
> (a) Promote the following waste management practices **in order of priority.**
>> (1) Source reduction.
>> (2) *Recycling* and composting.
>> (3) Environmentally safe transformation and environmentally safe land disposal, at the discretion of the city or county.
>
> (b) Maximize the use of **all feasible** source reduction, *recycling,* and composting options in order to reduce the amount of **solid waste** that must be disposed of by transformation and land disposal. For wastes that cannot feasibly be reduced at their source, recycled, or composted, the local agency may use environmentally safe transformation or environmentally safe land disposal, or both of those practices.

Cal. Pub. Res.Code § 40051 (emphases added). The CIWMA defines "solid waste" to include sewage sludge, *id.* § 40191, and "recycling" to include "cleansing, treating, and reconstituting materials that would otherwise become solid waste, and returning them to the economic mainstream in the form of raw material for new, reused, or reconstituted products which meet the quality standards necessary to be used in the marketplace," *id.* § 40180. Indeed, it is undisputed that land application of biosolids, therefore, constitutes recycling of solid waste within the meaning of the statute.

The CIWMA thus uses mandatory language to require that local agencies such as Kern recycle solid wastes—including biosolids—that cannot be eliminated through source reduction. Moreover, it mandates that they "maximize" all "feasible" methods of recycling, and it does so specifically to further the goal of diverting solid waste from landfills *Valley Vista Servs., Inc. v. City of Monterey Park,* 118 Cal.App.4th 881, 886, 13 Cal.Rptr.3d 433 (Ct.App.2004) (citing *City of Alhambra v. P.J.B. Disposal Co.,* 61 Cal.App.4th 136, 138, 71 Cal.Rptr.2d 364 (Ct.App.1998)): *see also Waste Mgmt. of the Desert, Inc. v. Palm Springs Recycling Ctr., Inc.,* 7 Cal.4th 478, 494, 28 Cal.Rptr.2d 461, 869 P.2d 440 (1994); *County Sanitation,* 127 Cal.App.4th at 1567, 27 Cal.Rptr.3d 28 ("This legislation caused sewage sludge to be diverted from disposal in landfills in favor of recycling it as a fertilizer applied to agricultural land.").

Given CIWMA's mandate to recycle solid waste, Measure E's ban on land application of biosolids amounts to a ban on activity that the state statute attempts to promote. As the Court held in ruling on the motion for the preliminary injunction:

> In light of this mandatory language, CIWMA's savings clause offers Kern little comfort. Although the act allows local regulations that do not conflict with state policies, Cal. Pub. Res.Code § 40053, the California Supreme Court

has indicated that "when a statute or statutory scheme seeks to promote a certain activity and, at the same time, permits more stringent local regulation of that activity, local regulation cannot be used to completely ban the activity or otherwise frustrate the statute's purpose." *Great W. Shows, Inc. v. County of Los Angeles,* 27 Cal.4th 853, 868, 118 Cal.Rptr.2d 746, 44 P.3d 120 (2002) (citing *Blue Circle Cement, Inc. v. Board of County Commissioners of County of Rogers,* 27 F.3d 1499, 1506–07 (10th Cir. 1994)); *cf. Int'l Bhd. of Elec. Workers v. City of Gridley,* 34 Cal.3d 191, 193, 193 Cal.Rptr. 518, 666 P.2d 960 (1983) ("Although the Legislature did not intend to preempt all aspects of labor relations in the public sector, we cannot attribute to it an intention to permit local entities to adopt regulations which would frustrate [its] declared policies and purposes...."); *Geier v. Am. Honda Motor Co., Inc.,* 529 U.S. 861, 869, 120 S.Ct. 1913, 146 L.Ed.2d 914 (holding that a "saving clause ... does not bar the ordinary working of conflict preemption principles").

*Kern II,* 462 F.Supp.2d at 1115–16. Therefore, for the same reasons that allowed Plaintiffs to survive the motion to dismiss and to prevail on the motion for the preliminary injunction, the Court concludes that Measure E is inimical to the goals of the CIWMA, contradicts it, and is therefore preempted.

### (2). Kern's Counterarguments Are Unavailing

Kern makes a variety of contentions otherwise, some of which merely repackage contentions the Court has previously rejected, and some of which are new. Each lacks merit.

### (a). The Water Board's Authority Is Irrelevant

Kern first argues that Measure E does not conflict with the CIWMA and is therefore not preempted because (1) the CIWMA provides that it does not constrain the authority of the State Water Board, and (2) Measure E is a local regulation authorized by Water Code section 13274 and requirements promulgated by the State Water Board for the land application of biosolids. (Defs'. Opp. at 7–9; Defs'. Mot. at 18–21.) The first premise is uncontested; the CIWMA provides:

(a) This division, or any rules or regulations adopted pursuant thereto, is not a limitation on the power of any *state agency* in the enforcement or administration of any provision of law which it is specifically authorized or required to enforce or administer, including, but not limited to, the exercise by the state water board or the regional water boards of any of their powers and duties pursuant to Division 7 (commencing with Section 13000) of the Water Code....

Cal. Pub. Res.Code § 40055(a) (emphasis added).[16] But this provision simply does not take Kern where it wants to go because Kern is not a *state agency,* and thus section 40055(a) does not exempt its conduct from the limitations imposed by the CIWMA. In other words, section 40055(a) merely allocates jurisdiction between *state regulatory agencies,* and does not purport to describe the power of *local government agencies.*

Moreover, Kern's second premise is flawed because neither the Water Code nor the Water Board's regulations purport to "authorize" local regulations of biosolids, nor to delegate the Water Board's authority to local agencies such as Kern.

---

**16.** The reference in section 40055(a) to "[t]his division" means Division 30 of the Public Resources Code, which encompasses the entire CIWMA, including its policy in favor of recycling in section 40051.

Cal. Water Code § 13274(i) provides only that:

> Nothing *in this section* restricts the authority of a local government agency to regulate the application of sewage sludge and other biological solids to land within the jurisdiction of that agency, including, but not limited to, the planning authority of the Delta Protection Commission, the resource management plan of which is required to be implemented by local government general plans.

(emphasis added). Similarly, the state Water Board's General Order 2004–0012 merely states that *its own provisions* do not preempt local agencies' authority to regulate biosolids. (Hogan Decl., Ex. 5 [General Order] ¶ 20.)[17] In other words, neither section 13274 nor the General Order purport to confer any authority at all to local agencies, much less the Water Board's authority to regulate biosolids unconstrained by the *CIWMA*. Rather, both provisions are merely savings clauses themselves, and neither can "save" what CIWMA has already curtailed.

*(b). The CIWMA Does Not Conflict with the Water Code, Nor with the Federal Clean Water Act*

■ Like its first argument, Kern's second contention overlooks the difference between an affirmative grant of authority and the mere absence of a restriction. Kern contends (Defs'. Opp. at 9–12; Defs'. Mot. at 15–18) that if the CIWMA were construed to prohibit local bans on land application of biosolids, it would conflict with the provisions of the Water Code known as the Porter–Cologne Act, Cal. Water Code §§ 13000, *et seq.*, which do not require local government to allow land application. To resolve this conflict, Kern urges the Court to allow the Water Code to control because it is a specific statute that governs biosolids and therefore, Kern argues, takes precedence over the CIWMA's more general policy in favor of recycling solid waste. (Defs'. Opp. at 9–13.) Again, Kern is wrong.

■ While an interpretive canon does hold that a more specific state statute will control a more general one, *e.g.*, *Pac. Lumber Co. v. State Water Res. Control Bd.*, 37 Cal.4th 921, 942, 38 Cal.Rptr.3d 220, 126 P.3d 1040 (2006), this rule "only applies when an *irreconcilable* conflict exists between the general and specific provisions," *id.* (emphasis added). But here, no such conflict exists. As explained above, the relevant provision of the Porter–Cologne Act is merely *a savings clause* providing that section 13274 of the Water Code does not restrict local agencies' authority to regulate biosolids. *See* Cal. Water Code § 13274(i). Because the savings clause *is not an affirmative grant of authority*, it is easily reconciled with the CIWMA's independent restrictions: put simply, the Porter–Cologne Act does not purport to authorize what the CIWMA prohibits. Therefore, the more general statute does not conflict at all, let alone irreconcilably, with the more specific one.

17. The General Order states that "it does not preempt or supercede the authority of local agencies to *prohibit,* restrict, or control the use of biosolids subject to their control, as allowed undercurrent law." (Hogan Decl., Ex. 5 [General Order] ¶ 20.) The word "prohibit" suggests that the state Water Board thought it was "saving" local agencies' power to enact complete bans on land application— a power the Court concludes was already curtailed by the CIWMA. Notably, however, the General Order does not purport to interpret the provisions of the CIWMA, and in any event Kern does not now argue that any deference is required to this apparently erroneous administrative interpretation, probably because the Court previously declined to do so. *Kern II*, 462 F.Supp.2d at 1116 n. 3. Rather, Kern essentially argues that the Order itself constitutes a delegation of the Water Board's authority. As explained above, the Court disagrees.

Equally unavailing is Kern's contention (Defs'. Opp. at 12) that the CIWMA conflicts with Cal. Water Code § 13263(g), which states: "No discharge of waste into the waters of the state, whether or not the discharge is made pursuant to waste discharge requirements, shall create a vested right to continue the discharge. All discharges of waste into waters of the state are privileges, not rights." This provision offers Kern little help because, as Plaintiffs correctly note, they have not contended that Measure E infringes on a "right" to land apply biosolids, nor does their position imply that the CIWMA purports to create such a "right." Obviously, parties that recycle solid waste must do so in accordance with valid health and safety restrictions—such as the previous Kern biosolid ordinance, which limited the pathogen content of the sludge that could be used as fertilizer, and was therefore entirely consistent with the CIWMA's priority in favor of recycling. For CIWMA to preempt Measure E is entirely consistent with the lack of a "right" to discharge waste.

Additionally, Kern argues bizarrely (Opp. at 12–13; Mot. at 16) that if the CIWMA were construed to prohibit local bans on land application, it would somehow "conflict" with the federal Clean Water Act. Kern does not explain this position in any detail or even cite to a specific provision in the Clean Water Act, but its citations to *United States v. Cooper*, 173 F.3d 1192, 1200 (9th Cir.1999), and *Welch v. Board of Supervisors of Rappahannock County, Virginia*, 888 F.Supp. 753, 759–60 (W.D.Va.1995), suggest that it again has confused the absence of a restriction with an express grant of authority. As this Court noted in ruling on the motion to dismiss, both *Cooper* and *Welch* merely held that the Clean Water Act itself did not preempt local biosolids bans (a construction upon which this Court relied in dismissing Plaintiffs' Clean Water Act

claim). *Kern I*, 2006 WL 3073172, at *11 – 12. But merely because the Clean Water Act *does not preempt* local bans on land application does not mean that it *expressly authorizes* them despite state constitutional limitations to the contrary.

Therefore, the CIWMA interpretation advanced by Plaintiffs does not conflict with the state Water Code, nor with the federal Clean Water Act, and thus those provisions do not control the outcome here.

*(c). The CIWMA's Savings Clauses Do Not Rescue Measure E*

■ The next portion of Kern's argument (Defs'. Opp. at 13–18) essentially contends that Measure E is not preempted because it falls within the scope of two statutes that allow local control, Cal. Pub. Res.Code §§ 40059 and 41851. In its introduction to this argument, however, Kern attempts some further misdirection: it cites case law that stands for the proposition that "preemption by implication" will not be found when the Legislature has expressed its intent to allow local regulations, or where there is a significant local interest to be served that may differ from one locality to another. *Waste Res. Techs. v. Dep't of Pub. Health*, 23 Cal.App.4th 299, 304, 28 Cal.Rptr.2d 422 (Ct.App.1994); *City of Dublin v. County of Alameda*, 14 Cal.App.4th 264, 276, 17 Cal.Rptr.2d 845 (Ct.App.1993). While both propositions are correct, they are essentially irrelevant here because as the cited cases indicate, they are rules to guide the analysis of "preemption by implication"—the term California courts use for "field" preemption. As a result, the rules have no application here because Plaintiffs assert not field preemption, but conflict preemption. Kern thus mischaracterizes the very nature of Plaintiff's preemption argument, which, even if Plaintiffs are correct, leaves local governments substantial room to reg-

ulate in ways consistent with Cal. Pub. Res.Code § 40051 and with the pecularities of local waste management interests.

The substance of Kern's argument fares no better. First, contrary to Kern's suggestion, Measure E is not saved by Cal. Pub. Res.Code § 40059(a), which provides in full:

(a) Notwithstanding any other provision of law, each county, city, district, or other local governmental agency may determine all of the following:

(1) Aspects of solid waste handling *which are of local concern,* including, but not limited to, frequency of collection, means of collection and transportation, level of services, charges and fees, and nature, location, and extent of providing *solid waste handling services.*

(2) Whether the services are to be provided by means of nonexclusive franchise, contract, license, permit, or otherwise, either with or without competitive bidding, or if, in the opinion of its governing body, the public health, safety, and well-being so require, by partially exclusive or wholly exclusive franchise, contract, license, permit, or otherwise, either with or without competitive bidding. The authority to provide solid waste handling services may be granted under terms and conditions prescribed by the governing body of the local governmental agency by resolution or ordinance.

(emphases added). "Solid waste handling" is defined as "the collection, transportation, storage, transfer, or *processing* of solid wastes." *Id.* § 40195 (emphasis added). "Processing" in turn includes "recycling" of solid waste. *Id.* § 40172. From this, Kern argues that the CIWMA authorizes local governments to determine the nature, location, and extent of recycling activities in their jurisdictions, and that this authority includes the power to ban land application of biosolids. (Defs'. Opp. at 16.)

■ This argument amounts to sleight of hand. By focusing on the meaning of the phrase "solid waste handling," Kern asks the Court to ignore the other crucial modifiers in section 40059(a), which limit counties' plenary authority to matters "of local concern" and "services." As Plaintiffs note, California courts have consistently interpreted this statute to preserve local power over trash haulers and garbage collection *services, see Rodeo Sanitary Dist. v. Bd. of Supervisors,* 71 Cal. App.4th 1443, 1451, 84 Cal.Rptr.2d 601 (Ct.App.1999); *Valley Vista Servs., Inc.,* 118 Cal.App.4th at 890, 13 Cal.Rptr.3d 433; *Waste Res. Techs.,* 23 Cal.App.4th at 309, 28 Cal.Rptr.2d 422, but Kern cites no case that has construed it to allow a city or county to completely ban a particular *method* of recycling. And, in the Court's view, the statute does not save Measure E here because Measure E is not a regulation of the *services* that support land application, but rather the practice itself. Nor does it address other "[a]spects of solid waste handling which are of local concern," Cat. Pub. Res.Code § 40059(a)(1), as it purports to address health and safety priorities that will not vary across communities. Put simply, Kern has not attempted merely to regulate the particular locations at which land application may take place. Rather, Measure E is a jurisdiction-wide ban that has not been supported by any evidence or argument that Kern County's unique local circumstances make it less appropriate than other jurisdictions for land application. Indeed, the stated justification for Measure E is that biosolids are so inherently dangerous that they cannot be used as fertilizer even when they comply with sophisticated safety requirements mandated by state and federal regulators. To construe this as a "local concern" would

deprive the words of all meaning, and thereby allow communities to opt out of the mandatory hierarchy in Cal. Pub. Res. Code § 40051—a result which the Legislature could not have intended when it crafted a provision centered on waste hauling *services.* Therefore, the Court rejects Kern's reliance on Cal. Pub. Res.Code § 40059(a).[18]

The second savings clause Kern invokes is Cal. Pub. Res.Code § 41851, which is more obviously irrelevant. (Defs'. Opp. at 6, 14, 19; Defs'. Mot. at 15.) The section provides: "Nothing *in this chapter* shall infringe on the existing authority of counties and cities to control land use or to make land use decisions, and nothing in this chapter provides or transfers new authority over that land use to the board." Cal. Pub. Res.Code § 41851 (emphasis added). "[T]his chapter" refers to chapter 7 of the Public Resources Code, which encompasses sections 41800 through 41851 but *not* the mandate in section 40051. Therefore, the savings clause in section 41851 has no bearing here.

### (d). The CIWMA Does Not Leave Cities and Counties Free to Ban "Feasible" Methods of Recycling

Kern also argues that because the CIWMA does not mandate *particular methods* of recycling over others, it is free to ban one such method. (Defs'. Opp. at 16–17.) Kern cites *City of Dublin* for this proposition, but that case dealt not with a manner of *recycling,* but with a county initiative which banned *incineration* of solid waste. 14 Cal.App.4th at 278, 17 Cal.Rptr.2d 845. Though the CIWMA did not preempt the incineration ban, this was because nothing in the CIWMA required counties to allow incineration, since " '[e]nvironmentally safe transformation and environmentally safe land disposal' are *last* in the [CIWMA]'s priority list of waste management practices, and are to be promoted *'at the discretion of the city or county.'* " *Id.* (citing Cal. Pub. Res.Code § 40051(a)) (first emphasis added). Here, by contrast, recycling is first on the CIWMA's priority list after source reduction, and is not something that cities or counties are given discretion whether to promote. *See* Cal. Pub. Res.Code § 40051(a). Therefore, *City of Dublin* is easily distinguished, leaving Kern's position without authority.

Moreover, Kern is wrong when it suggests that the CIWMA tolerates all bans on particular methods of recycling. The statute specifically mandates that local governments "[m]aximize the use of *all feasible* source reduction, *recycling,* and composting options in order to reduce the amount of solid waste that must be disposed of by transformation and land dis-

---

**18.** The Court's conclusion finds support in at least two interpretive canons. First, "every statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect." *Select Base Materials v. Board of Equalization,* 51 Cal.2d 640, 645, 335 P.2d 672 (1959). Kern's reading of § 40059(a) would violate this canon by essentially ignoring § 40051. Second, under the principle of ejusdem generis, courts "should construe a statute's general terms following specific terms as embracing only objects similar in nature to the specific terms." *E.g., Fogarty v. City of Chico,* 148 Cal.App.4th 537, 544, 55 Cal.Rptr.3d 795 (Ct.App.2007). Kern's read-

ing would violate this canon by interpreting "of local concern" to mean something far different than the other terms that accompany it, which address "frequency of collection, means of collection and transportation, level of services, charges and fees, and nature, location, and extent of providing solid waste handling *services* " Cal Pub. Res.Code § 40059(a) (emphasis added). In other words, although Kern has articulated permissible *interests* that Measure E rationally furthers, *see supra* Parts IV.A–B, the Court does not construe § 40059(a) to allow plenary pursuit of such interests. Local interests are not necessarily, and are not here, matters "of local concern."

posal." *Id.* § 40051(b) (emphases added). Kern has not argued that land application is not a "feasible" method of recycling within the meaning of the statute, likely because the practice is widespread, encouraged by the federal Environmental Protection Agency, and has been ongoing in Kern County itself since the mid 1990s. (*See, e.g.,* Pls'. Ex. 11 [National Research Council Report: Biosolids Applied to Land: Advancing Standards and Practices, 2002] at 313 ("The committee recognizes that land application of biosolids is a widely used, practical option for managing the large volume of sewage sludge generated at wastewater treatment plants that otherwise would largely need to be disposed of at landfills or by incineration."); Pls'. Ex. 1 [Minimide P.I. Decl.] ¶¶ 19–21.) Therefore, Kern cannot escape CIWMA's mandate to "maximize" the practice.

### (e). CIWMA Preemption Does Not Mandate That Counties Accept Recycling Materials from Other Jurisdictions

Next, Kern argues that the CIWMA "does not require a city or county to allow other local agencies to conduct their recycling activities in its jurisdiction." (Defs'. Opp. at 19.) Kern is correct, but the point is irrelevant. While CIWMA is neutral with regard to recycling activities across counties, Measure E does not merely prohibit land application of out-of-county biosolids (likely because its drafters were familiar with Commerce Clause jurisprudence that would look unfavorably on such an approach). Rather, Measure E is a broad ban of an entire method of recycling, which Kern has not argued is "infeasible." Therefore, the absence in CIWMA of a mandate to accept materials from other jurisdictions offers Kern no comfort here.

### (f). That Measure E Only Prohibits a Particular Method of an Encouraged Activity Does Not Save It from the Rule in Blue Circle Cement

As noted above, the California Supreme Court has indicated that "when a statute or statutory scheme seeks to promote a certain activity and, at the same time, permits more stringent local regulation of that activity, local regulation cannot be used to completely ban the activity or otherwise frustrate the statute's purpose." *Great W. Shows, Inc.,* 27 Cal.4th at 868, 118 Cal. Rptr.2d 746, 44 P.3d 120 (citing *Blue Circle Cement,* 27 F.3d at 1506–07). Although the quoted language is merely the court's distillation of the rule from *Blue Circle Cement,* which it then distinguished, Kern acknowledges the rule and does not contend that the state high court would reject it if squarely presented with the question. (*See* Defs'. Opp. at 19; Defs'. Mot. at 16.) Rather, Kern contends that Measure E does not fall within the rule, because the ordinance prohibits only one manner of use of one type of material. (Defs'. Opp. at 19; Defs'. Mot. at 23.) In other words, Kern argues that because Measure E is not a *complete ban* on solid waste recycling, it is not preempted.

This argument fails for two reasons. First, Kern overlooks the portion of the *Blue Circle Cement* rule that states "local regulation cannot be used to completely ban the activity *or otherwise frustrate* the statute's purpose." *Great W. Shows, Inc.,* 27 Cal.4th at 868, 118 Cal.Rptr.2d 746, 44 P.3d 120 (citing *Blue Circle Cement.,* 27 F.3d at 1506–07) (emphasis added). Thus, contrary to Kern's suggestion, the absence of a complete ban is not dispositive. Moreover, the Legislature expressed its purpose to encourage recycling of biosolids themselves by including them in the definition of solid waste, *see* Cal. Pub. Res.Code

§ 40191, which is not at all surprising given that the generation of biosolids that must be recycled or disposed of, is a "constant, non-discretionary governmental function." (DOSSUF ¶ 10.) Therefore, Measure E's total ban on a major method of recycling—with only a de minimis exemption for residential fertilizer products—clearly frustrates the CIWMA's purpose, notwithstanding the fact that at a high level of abstraction, it is not a complete ban on the recycling of solid waste.

Therefore, the Court rejects Kern's final argument against CIWMA preemption. Plaintiffs' motion for summary adjudication of this claim is **GRANTED** and Kern's is **DENIED**.

### 5. THE POLICE POWERS CLAIM

Finally, Plaintiffs contend Measure E exceeds Kern's police power under the California Constitution because it is not reasonably in the welfare of the region as a whole. As discussed below, the Court cannot summarily adjudicate this claim in favor of either party.

### a. Overview of California's Constitutional Restriction on the Police Power

 In contrast to the Equal Protection claim, Kern cannot defend against Plaintiffs' police powers claim merely by resort to rational speculation. In California, a local government's exercise of its police power, Cal. Const. art. XI, § 7, is valid if "if it is fairly debatable that the restriction *in fact* bears a reasonable relation to the general welfare." *Associated Home Builders of the Greater Eastbay, Inc. v. City of Livermore,* 18 Cal.3d 582, 601, 135 Cal.Rptr. 41, 557 P.2d 473 (1976) ("*Associated Home Builders* ") (emphasis added). "[I]f a restriction significantly affects residents of surrounding communities, the constitutionality of the restriction must be measured by its impact not only upon the welfare of the enacting communi-

ty, but upon the welfare of the surrounding region." *Id.*

In evaluating ordinances with effects on surrounding communities, the court must identify and weigh the competing interests affected by the ordinance and ask "whether the ordinance, in light of its probable impact, represents a reasonable accommodation" of those competing interests. *Id.* at 609, 135 Cal.Rptr. 41, 557 P.2d 473. Although the Court may elect to defer to the judgment of the local entity,

> [j]udicial deference is not judicial abdication. The ordinance must have a *real and substantial relation* to the public welfare. There must be a reasonable basis *in fact, not in fancy,* to support the legislative determination ... [a]lthough in many cases it will be 'fairly debatable' that the ordinance reasonably relates to the regional welfare....

*Id.* (emphases added).

### b. Kern's Motion

Kern advances four arguments against Plaintiffs' police powers claim, each of which lacks merit. First, it contends that the *Associated Home Builders* doctrine applies only to local enactments that limit immigration into a community. (Defs'. Mot. at 23–24.) This argument makes far too much of a phrase in the introduction of *Associated Home Builders,* where the California Supreme Court stated:

> We take this opportunity, therefore, to reaffirm and clarify the principles which govern validity of land use ordinances *which substantially limit immigration into a community,* we hold that such ordinances need not be sustained by a compelling state interest, but are constitutional if they are reasonably related to the welfare of the region affected by the ordinance.

18 Cal.3d at 589, 135 Cal.Rptr. 41, 557 P.2d 473. From this, Kern argues that the

*Associated Home Builders* "regional welfare" doctrine applies only to ordinances affecting immigration and that, therefore, Plaintiffs' police power claim fails because they offer no evidence that Measure E affects immigration. (Defs'. Mot. at 23–24.) Kern is wrong. A full reading of *Associated Home Builders* indicates the court merely used the language above to frame the issue before it, which concerned a local moratorium on residential building permits until local educational, sewage disposal, and water facilities complied with specified standards 18 Cal.3d at 588, 135 Cal.Rptr. 41, 557 P.2d 473. The court considered the regional welfare not because of the ordinance's subject matter, but because it imposed effects on citizens of surrounding communities. Using language generally applicable to land use ordinances of all stripes, the court stated:

> We.. reaffirm the established constitutional principle that a local land use ordinance falls within the authority of the police power if it is reasonably related to the public welfare. Most previous decisions applying this test, however, have involved ordinances without substantial effect beyond the municipal boundaries. The present ordinance, in contrast, significantly affects the interests of nonresidents who are not represented in the city legislative body and cannot vote on a city initiative. We therefore believe it desirable for the guidance of the trial court to clarify the application of the traditional police power test to an ordinance which significantly affects nonresidents of the municipality.
>
> When we inquire whether an ordinance reasonably relates to the public welfare, inquiry should begin by asking Whose welfare must the ordinance serve. In past cases, when discussing ordinances without significant effect beyond the municipal boundaries, we have been content to assume that the ordinance need only reasonably relate to the welfare of the enacting municipality and its residents. But municipalities are not isolated islands remote from the needs and problems of the area in which they are located; thus an ordinance, superficially reasonable from the limited viewpoint of the municipality, may be disclosed as unreasonable when viewed from a larger perspective.

*Id.* at 607, 135 Cal.Rptr. 41, 557 P.2d 473. Thus, as the *Associated Home Builders* court made clear, the salient feature of the ordinance at issue was not simply that it affected immigration, but rather that it invoked the police power and had substantial effects on citizens outside the city's borders.[19] So too does Measure E.

Second, Kern is incorrect when it cites *City of Cupertino v. City of San Jose,* 33 Cal.App.4th 1671, 40 Cal.Rptr.2d 171 (Ct. App.1995), for the proposition that California courts have limited *Associated Home Builders* to "growth control and housing ordinances." (Defs'. Mot. at 24.) In *Cupertino,* the court held the regional welfare constraint on the police power did not apply to a local tax on landfill space because the tax invoked *a different source of local power*—the power of a charter city to tax under the "municipal affairs" clause of Article XI, Section 5, subdivision (a) of the California Constitution. 33 Cal. App.4th at 1677, 40 Cal.Rptr.2d 171. Although *Cupertino* declined to expand the

---

19. The *Associated Home Builders* court explained that the reason such enactments had to be viewed from the perspective of the affected region was that in enacting a land use regulation, the local government was acting as a delegate of the state's police power and therefore was restricted in the same manner as the state. 18 Cal.3d at 608, 135 Cal.Rptr. 41, 557 P.2d 473 (citing *S. Burlington County N.A.A.C.P. v. Mount Laurel Twp.,* 67 N.J. 151, 336 A.2d 713, 726 (1975))

regional welfare doctrine to "municipal affairs" enactments, it never purported to narrow *Associated Home Builders* to particular types of police power enactments. *See id.* And contrary to Kern's suggestion, *Cupertino* also did not purport to exclude harmful effects such as impacts on commerce and contracts from the regional welfare doctrine. *See id.* at 1677–78, 40 Cal.Rptr.2d 171.[20] Therefore, because *Cupertino* did not address limitations on the police power, it is inapposite here.

■ Third, the Court is unpersuaded by Kern's rhetorical argument that health and safety measures should be exempt from limitations on the police power generally. (Defs'. Mot. at 24.) Although health and safety purposes are certainly laudatory and may well weigh heavily as the court evaluates whether an enactment is a reasonable accommodation of the competing interests, it would be bizarre if an ordinance could avoid scrutiny entirely merely by adopting the label "health and safety." As this case itself illustrates, a purported health and safety enactment may have wide-ranging effects on surrounding communities, and may simply seek to cure such hypothetical ills as to be unreasonable in light of the burdens it imposes. *Cf. Kassel v. Consolidated Freightways Corp. of Delaware*, 450 U.S. 662, 670, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981) ("Regulations designed for that salutary purpose [of public safety] nevertheless may further the purpose so marginally, and interfere with commerce so substantially, as to be invalid under the Commerce Clause."). Moreover, nearly all exercises of the police power purport to advance health and safety purposes, and therefore the regional welfare doctrine would be rendered toothless if health and safety purposes exempted an enactment from scrutiny. *See City of Cupertino*, 33 Cal.App.4th at 1677, 40 Cal. Rptr.2d 171 ("The purpose of the [police] power is to permit cities to promote the health and safety of their residents . . . ." (citing *Birkenfeld v. City of Berkeley*, 17 Cal.3d 129, 159–60, 130 Cal.Rptr. 465, 550 P.2d 1001 (1976))). Therefore, the Court holds that Measure E does not avoid the regional powers doctrine simply because it advances a health and safety purpose. Finally, the Court finds no merit to Kern's assertion that the regional welfare doctrine is rendered inapplicable because federal and state statutes contemplate some local regulation of biosolids. (Defs'. Mot. at 24–25.) As discussed above in the context of Plaintiffs' CIWMA claim, the federal and state savings clauses do not purport to free local enactments from all conceivable limitations. They thus cannot save Measure E if it otherwise violates the regional welfare doctrine.

---

**20.** *Cupertino* reasoned that it should not *expand* the regional welfare doctrine to cover the landfill tax because outsiders could avoid its essentially economic effects simply by declining to ship their waste into the jurisdiction. 33 Cal.App.4th at 1677–78, 40 Cal. Rptr.2d 171. The court distinguished *Associated Home Builders* as presenting less avoidable harmful effects because the ban on residential housing permits would force dwellings that would otherwise have been built in Livermore to be built instead in surrounding communities. *Id.* at 1677, 40 Cal.Rptr.2d 171. However, even if this "avoidability" rationale were a basis for *narrowing* the regional power doctrine to exempt certain police power enactments, it would not save Measure E from scrutiny. As indicated above, Measure E applies to Kern's biosolids as well, which means that the biosolids it pays its private contractor (SJC) to process cannot be applied to land in Kern's jurisdiction. Therefore, Measure E would force surrounding communities to accept Kern's biosolids, as the only market for SJC's compost would be in jurisdictions that allowed land application Measure E therefore has unavoidable effects on surrounding communities, and thus *Cupertino* presents no principled reason to distinguish *Associated Home Builders* from the instant case.

These being Kern's only attacks against the police powers claim, Kern's motion for summary adjudication on this cause of action is **DENIED.**

### c. Plaintiffs' Motion

Plaintiffs contend they are entitled to summary judgment on the police powers claim because they have presented evidence that Measure E will impose severe economic impacts on Plaintiffs' land application programs, increased costs and fewer biosolids management options on wastewater agencies throughout the state, and harmful effects on the regional environment. (Pls'. Opp. at 23.)

The Court agrees that Plaintiffs have introduced such evidence. It also concludes that Measure E would not reasonably further the regional welfare if its inevitable, practical effect were merely to shift biosolids—which are inevitably generated—from relatively safe sites in Kern to sites that were less safe or further away. But the Court cannot agree that Plaintiffs are entitled to summary adjudication. First, questions of fact remain as to whether Green Acres is as well-suited to land application as Plaintiffs contend. Kern has introduced evidence that the site attracts large amounts of flies and emits noxious odors, which disrupt a nearby recreation area. (Frantz. Decl. ¶¶ 17, 19.) The record also indicates that Green Acres lies adjacent to one water banking facility and a short distance from another, and that the groundwater from beneath Green Acres could flow into the water banks when water is extracted from them during dry seasons. (Defs'. Ex. 41 [Parker Decl.] ¶¶ 2, 8–9; Defs'. Ex. 40 [Collup Decl.] ¶ 12.) Even given the apparently low *likelihood* that land application Green Acres would introduce contaminants into the groundwater (Pls'. Ex. 3 [Johnson P.I. Decl.] ¶ 8), the *tremendous amount* of harm to the water banks that could result is sufficiently palpable that a trier of fact

could conclude Green Acres is not an ideal location. *Cf. United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir.1947) ("if the probability be called P; the injury, L; and the burden, B; liability depends upon whether B is less than L multiplied by P: i.e., whether B < [is less than] PL."). And the record contains virtually no evidence concerning Tule Ranch or Honeybucket Farms, which means Plaintiffs have not yet carried their burden to demonstrate that restrictions on these facilities could not reasonably further the regional welfare.

Second, a trier of fact could also conclude that Measure E's harmful impacts would largely result from the government Plaintiffs' choice to ship their biosolids far from their home jurisdictions. As noted above, the record contains no evidence as to why the government Plaintiffs elect not to dispose the materials closer to home. If the reason were that no suitable, close by sites were reasonably available, that would suggest Kern was the best option and therefore that Measure E did not accommodate the regional welfare. But the record would equally support an inference that the government Plaintiffs send their biosolids to Kern out of the same "not in my backyard" mentality that appears to have motivated Measure E. From this inference, the trier of fact might properly conclude that it was "fairly debatable" that Measure E's burdens on the region were justified by the local interest in unnecessarily serving as a dumping ground for other communities' waste.

As a result, the Court cannot conclude as a matter of law that Measure E is not reasonably related to the regional welfare. Plaintiffs' motion for summary adjudication of the police powers claim is therefore **DENIED.**

### B. PLAINTIFFS' REQUEST FOR ENTRY OF JUDGMENT

▆▆▆ Correctly anticipating that at least one of their claims could not be resolved summarily, Plaintiffs request entry of final judgment on the CIWMA claim. The request is governed by Rule 54(b), which provides in relevant part:

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. . . .

Fed.R.Civ.P. 54(b). Although the Ninth Circuit was at one point somewhat skeptical of Rule 54(b) judgments, *see Morrison–Knudsen Co., Inc. v. Archer,* 655 F.2d 962, 965 (9th Cir.1981) ("Judgments under Rule 54(b) must be reserved for the unusual case in which the costs and risks of multiplying the number of proceedings and of overcrowding the appellate docket are outbalanced by pressing needs of the litigants . . . ."), the "present trend is toward greater deference to a district court's decision to certify," *Texaco, Inc. v. Ponsoldt,* 939 F.2d 794, 797–98 (9th Cir.1991) (citations and quotation marks omitted) (criticizing *Morrison–Knudsen* as "outdated and overly restrictive"). Indeed, the Circuit has stated relatively recently that "issuance of a Rule 54(b) order is a fairly routine act that is reversed only in the rarest circumstances." *James v. Price Stern Sloan, Inc.,* 283 F.3d 1064, 1067–68 n. 6 (9th Cir.2002).

Under even the more stringent approach, however, Rule 54(b) certification is appropriate here for several reasons. First, Plaintiffs agree that the remaining claims will be moot if the CIWMA issue is affirmed on appeal, as the CIWMA claim will afford them complete relief against enforcement of Measure E. The same reasoning applies to the Commerce Clause claim, and perhaps even more so because that claim arises under 42 U.S.C. § 1983. Moreover, the sole remaining claim involves an unusual application of the police powers doctrine in the field of municipal waste management, and therefore would inevitably require the Court to adjudicate novel questions of state law. Comity dictates that the Court avoid doing so unnecessarily. Finally, as discussed above, the police powers claim is extremely fact-intensive, and would require a good deal of discovery concerning the local effects of biosolids application in Kern County and the availability of alternative sites in the Southern California area. The parties have an interest in avoiding the time and expense of this exercise if possible.

For all these reasons, and also because Kern does not contend otherwise, the Court concludes the Rule 54(b) request has merit and that there is "no just reason for delay" of judgment.

### V.

### CONCLUSION

Kern's motion for summary adjudication of the Equal Protection is **GRANTED,** but its motions are denied as to all other claims. Plaintiffs' motions for summary adjudication of the Commerce Clause and CIWMA claims are **GRANTED,** while their motion for summary judgment on the police powers claim is **DENIED.** Plaintiffs' motion for entry of judgment is **GRANTED.** Plaintiff shall submit a proposed judgment in accordance with this opinion.

IT IS SO ORDERED.